### Dennis NAGEL, et al.

v.

### ADM INVESTOR SERVICES, INC., et al.

### No. 96 C 2675 *et al.*

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 23, 1999.

As Amended Sept. 3, 1999.

Timothy C. Klenk, Richard J. Rappaport, Alison C.B. Laing, Amy Beth Manning, Ross & Hardies, P.C., Chicago, IL, for ADM Investor Services, Inc.

Mark M. Lyman, Henery Karl Becker, Daniel G. Dolan, Jr., John D. Ruark, Henderson, Becker & Lyman, Chicago, IL, Jeffry Mark Henderson, Patrick Gerard King, Henderson and Lyman, Chicago, IL, for Brighton Commodities, Inc.

James L. Fox, Abramson & Fox, Chicago, IL, Kenneth M. Snodgrass, Jr., James Roland Grebe, Goldsworthy, Fifield & Hasselberg, Peoria, IL, for Oberbeck Feed Co.

## Opinion

EASTERBROOK, Circuit Judge.[†]

Plaintiffs in these five consolidated actions (Nos. 96 C 2675, 96 C 2741, 96 C 2879, 96 C 2972, and 96 C 5215) are farmers who entered into hedge-to-arrive (HTA) contracts with grain merchants (including grain elevators). Under a standard hedge-to-arrive contract the farmer promises to deliver a stated quantity of grain for a price linked to the price of a futures contract that expires in the delivery month. From the farmer's perspective, this is a normal forward contract that shifts to the buyer the risk that the market price will fall before delivery (and simultaneously prevents the farmer from taking advantage of rising prices). The merchant takes a short position in a traded grain futures contract expiring in the delivery month, and the position can be calculated so that the return from this contract offsets (that is, hedges) the market risk on the cash crop: if the price of the cash commodity falls, so that the grain merchant is obliged to pay the farmer more than the spot market price on delivery, this loss will be offset by a gain in the futures contract; similarly, if the cash market price rises (so that the merchant gets a bargain on delivery), there will be an offsetting loss on the

Adam K. Hollander, Mayer, Brown & Platt, Chicago, IL, Joel J. Bellows, Laurel G. Bellows, Nicholas P. Iavarone, Christopher L. Gallinari, Bellows & Bellows, Chicago, IL, Rebecca J. Wing, Chicago, IL, for Dennis Nagel, Darlene Nagel.

† Of the Seventh Circuit, sitting by designation.

futures contract. Both the farmer and the grain merchant thus can lock in a particular price. Contracts of this general kind have been used since the early 1980s.

The contracts at issue in these five suits are known as flexible or enhanced HTA agreements, because they permit the farmers to defer delivery to any month in which a futures contract expires. When the farmer defers delivery, the grain merchant buys in its existing short position and takes a new position in the new delivery month. (This is known as rolling the hedge.) The price payable on delivery of the grain is adjusted to reflect the difference between the cost of these positions, plus a small fee (often 2¢ a bushel). Although the farmer never transacts on a futures exchange, the right to postpone delivery and obtain a new price affords farmers the economic attributes of options to establish short positions in the futures market. See generally Glenn L. Norris, George F. Davison, Jr. & David N. May, *Hedge to Arrive Contracts and the Commodity Exchange Act: A Textual Alternative*, 47 Drake L.Rev. 319, 322–26 (1999); Note, *Risky Business: HTAS, The Cash Forward Exclusion and Top of Iowa Cooperative v. Schewe*, 44 Villanova L.Rev. 125 (1999).

When the spot price drops before the original delivery date, a farmer with a flex HTA delivers and takes his profit. When the price of the cash commodity rises, a farmer is tempted to defer delivery, sell the crop for cash (obtaining a price higher than the one the grain merchant is required to pay), and hope that the price falls again before the new delivery date, so that the farmer can cover his short position. If the price stays high, the farmer may defer delivery again; still betting on a fall. But if the price remains up, the farmer is in trouble—for selling short in a rising market can inflict heavy losses. Likewise the grain merchant, which may have to realize the loss in its short futures position and post extra margin pending delivery. (As the value of the contract rises, the required margin also rises.)

In 1995–96 the price of corn rose, farmers deferred delivery, grain merchants rolled the hedges, the price stayed high, and many deals broke down. Many farmers could not cover by delivering the cash commodity on the new date. Some farmers (though not necessarily any of the plaintiffs in these five cases) had contracted to deliver more grain than they had planted, hoping that deferrals would enable them to hide the shortfall from the grain merchants until prices dropped and the obligation could be covered. Had prices declined, these farmers would have reaped windfalls; as events transpired, however, the rising market spelled financial disaster. Some grain merchants either could not absorb losses in the interim (a counterparty credit risk that the farmers may not have anticipated) or refused to post extra margin once they suspected that the farmers lacked the cash commodity in the quantity specified by the contracts. When futures exchanges liquidated the merchants' positions, both middlemen and farmers were left with losses.

Plaintiffs in these suits contend that flex HTA contracts are "futures contracts" rather than "forward contracts" and therefore are unlawful—for futures contracts must be handled by boards of trade and registered futures commission merchants, 7 U.S.C. § 6(a), which the grain elevators are not. Congress distinguished between futures ("contracts for future delivery") and forward contracts in this way: "The term 'future delivery' does not include any sale of any cash commodity for deferred shipment or delivery." 7 U.S.C. § 1a(11). Defendants say that the flex HTA contracts come within this exception; plaintiffs argue otherwise. Plaintiffs' position has the support of the CFTC, at least when the deferral extends past a crop year. *In re Competitive Strategies for Agriculture, Ltd.*, No. 98–4 (Aug. 24, 1998). But the farmers' arguments have been uniformly unsuccessful in court. See, e.g., *The Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 317–22 (6th Cir.1998); *Abels v. Farmers Commodities Corp.*, No. 98–

3033–MWB (N.D.Iowa Mar. 26, 1999); *Lachmund v. ADM Investor Services, Inc.*, 26 F.Supp.2d 1107 (N.D.Ind.1998), appeal pending, 191 F.3d 777 (7th Cir.) (argued Feb. 23, 1999); *Barz v. Geneva Elevator Co.*, 12 F.Supp.2d 943 (N.D.Iowa 1998); *Top of Iowa Cooperative v. Schewe*, 6 F.Supp.2d 843 (N.D.Iowa 1998); *In re Grain Land Coop*, 978 F.Supp. 1267 (D.Minn.1997). One district court postponed decision by denying a motion to dismiss under Rule 12(b)(6), see *Eby v. Producers Co–op Inc.*, 959 F.Supp. 428 (W.D.Mich.1997), but *The Andersons* later nixed these claims for Michigan and the rest of the Sixth Circuit. No federal court has decided any of these suits in favor of any farmer.

Plaintiffs also contend that the grain merchants (and their own financial advisers) defrauded them by not supplying additional information, and in particular by not warning them of the risks of deferring delivery in a rising market and of the counterparty credit risk. These claims arise under state law—surely so if the judicial view about the identity of a futures contract is accepted here, and likely so even if plaintiffs prevail on that issue. Because complete diversity is missing, these claims come under the supplemental jurisdiction, 28 U.S.C. § 1367.

## I

Plaintiffs in *Wilson Farm v. ADM Investor Services, Inc.*, 995 F.Supp. 837 (N.D.Ill.1998), and *Brown v. ADM Investor Services, Inc.*, 995 F.Supp. 837 (N.D.Ill. 1998), signed HTA contracts that include arbitration clauses. Disputes between the farmers and the grain merchants are to be arbitrated by the National Grain and Feed Association. District Judge Manning, who handled these five cases before their reassignment to me, stayed *Wilson Farm* and *Brown* pending arbitration. 1997 U.S. Dist. LEXIS 21366 (N.D.Ill.1998). In each case the arbitral panel now has unanimously concluded that the farmer failed to deliver as promised and owes damages. Brown was ordered to pay $100,437.50 plus interest from August 26, 1996, to The De-

Long Co.; Wilson Farm and associates were directed to pay approximately $400,-000 plus interest from May 21, 1996, to Staley Grain, Inc. The beneficiaries seek confirmation and enforcement; the farmers ask me to vacate the awards.

■ Review under the Federal Arbitration Act is exceptionally narrow. 9 U.S.C. § 10(a). Plaintiffs essentially ignore the statutory grounds for setting aside awards and argue instead that Judge Manning should not have ordered arbitration in the first place. That argument is foreclosed by the law of the case, unless intervening developments justify a fresh look. But the caselaw remains lopsidedly against plaintiffs. All but one of the courts that have examined the question have held that contracts sending HTA disputes to the National Grain & Feed Association must be enforced. Compare *The Andersons*, 166 F.3d at 322–30; *Harter v. Iowa Grain Co.*, 1998 WL 440905 (N.D.Ill. Jul. 24, 1998) 1998 U.S. Dist. LEXIS 11600, appeals pending, Nos. 98–3010 & 98–3817 (7th Cir.) (to be argued Sept. 13, 1999); *Heitoff v. Cargill, Inc.*, No. 4–CV–96–337 (D.Neb. Mar. 21, 1997); *Harris Farms v. Continental Grain*, No. 96 C 4269 (N.D.Ill. Mar.18, 1997); *Herwig v. Hahnaman–Albrecht, Inc.*, 1997 WL 72079 (N.D.Ill.1997) 1997 U.S. Dist. LEXIS 1650; and *Hodge Brothers, Inc. v. The DeLong Co.*, 942 F.Supp. 412 (W.D.Wis.1996); with *Hoffman v. Cargill, Inc.*, 59 F.Supp.2d 861 (N.D.Iowa 1999). I find *Hoffman*, the only contrary decision, unpersuasive for reasons given below, and in *The Andersons*.

■ Plaintiffs ask the court to view arbitration with hostility because it does not use the same procedures as litigation. But that's the point of arbitration, which can be a time-and-money-saving device precisely *because* it does not use all of litigation's bells and whistles. See *Moseley, Hallgarten, Estabrook & Weeden, Inc. v. Ellis*, 849 F.2d 264, 268 (7th Cir.1988). The Arbitration Act ensures that courts no longer disregard arbitration clauses just because

arbitration is not as "good" as litigation from the perspective of the contracting party who now rues his bargain. Whether to accept rougher justice in exchange for cost savings is a question for contracting parties themselves. *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1150 (7th Cir.1997).

■ Plaintiffs disdained the opportunity to appear before the arbitral panels. They are therefore in no position to complain about either the procedures those panels used or the conclusions they reached. They have taken an all-or-nothing gamble: unless they can persuade me that *all* arbitration of HTA contracts before the Association is invalid in *every* case, they must lose. And they do lose, for the arguments they make would apply equally to all other commercial arbitration and abolish the institution of dispute resolution by merchant bodies.

Only two of plaintiffs' contentions require further comment. One is that 17 C.F.R. § 180.3(b) prohibits arbitration of disputes arising out of futures contracts. If, as plaintiffs contend, the flex HTAS are futures contracts, it follows (plaintiffs believe) that they cannot be required to arbitrate. But this is not right, for two reasons. First, § 180.3 applies only to a "claim or grievance," a phrase that 17 C.F.R. § 180.1(a) defines as "any dispute which arises out of any transaction on or subject to the rules of a contract market, executed by, or effected through a member of that contract market". Disputes about the flex HTAS do not arise out of a transaction on a contract market (that is, a futures exchange such as the Chicago Board of Trade), and they are not subject to its rules. Second, § 180.3(b) applies only to a "futures commission merchant, introducing broker, floor broker, commodity pool operator, commodity trading advisor, or associated person"—none of which DeLong or Staley is. The idea behind the regulation is that disputes between customers and futures merchants or futures markets should be settled in reparations proceedings before the CFTC. Because neither DeLong nor Staley is a regulated futures merchant, these disputes are outside the regulation's scope. The CFTC does not claim any power to regulate contracts between farmers and grain elevators. And when the domains of reparations and arbitration overlap—as they do when the grain dealer *also* is a futures merchant, yet the transactions do not take place on or subject to the rules of a board of trade—the CFTC believes that arbitration is permissible. In *Harter v. Iowa Grain Co.*, No. 98–R095 (CFTC May 20, 1999), the Commission rejected, on preclusion grounds, a reparations claim filed by a flex HTA customer whose dispute already had been arbitrated. If the Commission had deemed the arbitration incompatible with § 180.3, it would have decided the merits; instead it ordered the reparations action dismissed.

■ Plaintiffs' other principal objection to arbitration is that the National Grain & Feed Association is biased. They do not mean by this that any of the *arbitrators* is biased in the sense that he has a stake in the outcome. The argument, rather, is that approximately half of the Association's members use HTA contracts, and the Association has filed *amicus* briefs arguing that these contracts comply with federal law. It follows, plaintiffs insist, that the Association cannot conduct arbitration impartially. This is functionally the same as arguing that because the United States depends on tax revenues, and has a mammoth bureaucracy (the IRS) devoted to collecting hundreds of billions of dollars annually, federal judges cannot be impartial in tax cases. No sensible person uses this definition of partiality, however. That a particular judge has heard many tax cases, and regularly favors the IRS over the taxpayer, does not call the judge's impartiality into (objectively reasonable) question, any more than the fact that most judges convict most criminal defendants means that an accused cocaine dealer can't get a fair trial. See *Liteky v. United States*, 510 U.S. 540, 554–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

The right question is whether the arbitrators displayed evident partiality. 9 U.S.C. § 10(a)(2). Neither plaintiff·contends that any of the six arbitrators displayed partiality. That some (or all) of the arbitrators may be grain merchants does not equate to partiality; more likely it equates to expertise, and obtaining the benefits of the law merchant is a big reason why sophisticated commercial parties choose arbitration over litigation. Plaintiffs seek to turn this benefit of commercial arbitration into a fatal flaw. The Arbitration Act is set against that course.

Because Brown and the Wilsons do not offer any objection to the actual conduct or conclusion of their particular arbitrations, the awards are enforced.

Judge Manning also ordered Brown to submit to arbitration with Demeter, Inc., another grain merchant. Apparently neither Brown nor Demeter asked the Association to conduct that arbitration. Recently Brown filed a motion to dismiss his complaint (No. 96 C 5215) to the extent that it named any defendant other than Demeter and DeLong. (Notice of Voluntary Dismissal, filed August 10, 1999.) Because Brown promised by contract not to *litigate* against Demeter, and shows no desire to arbitrate, I assume that no dispute remains between Brown and Demeter and dismiss Brown's claim against Demeter for failure to prosecute.

## II

■ Plaintiffs seek to represent a class of similarly situated farmers. But I decline to certify the case as a class action. These are big-stakes disputes that easily can be (and are being) litigated one-on-one between farmers and grain elevators. Plaintiffs' suit does not fit the paradigm of Rule 23(a)(3)—small claims that are consequential only in the aggregate. See *In re Rhone–Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir.1995). It is easy for these parties to litigate one HTA contract at a time.

Rule 23(a)(4) adds that class certification is appropriate only if "the representative parties will fairly and adequately protect the interests of the class", and I do not think that plaintiffs (more accurately, their lawyers) meet this standard. See *Greisz v. Household Bank*, 176 F.3d 1012 (7th Cir.1999). Judge Manning struck the plaintiffs' first consolidated complaint because it was discombobulated, violating Fed.R.Civ.P. 8(e)(1). Not only her statements in open court but also her written orders reflect deep dissatisfaction with the performance of plaintiffs' counsel, and her order allowing plaintiffs to re-plead with the proviso that this would be their very last chance demonstrates the tenor of her views. The new complaint is better than the first, but still subpar. At 55 pages, with 12 "counts" (as if it were an indictment) and 148 numbered paragraphs, it is so distant from the model contemplated by Rule 8 and the Rules' Appendix of Forms that I have substantial doubt about counsel's ability to represent a class in litigation about complex risk-allocation devices. My review of the tedious memoranda counsel have filed fortifies this conclusion. One important part of a judge's job under Rule 23 is to protect putative class members from self-appointed champions whose work is not up to snuff.

Other considerations also augur against class certification. There are some common questions of law, see Rule 23(a)(2), principally the question about the status of flex HTAS as futures contracts, but these common questions do not predominate over other, person-specific questions. Different grain merchants used different contracts, and some merchants negotiated terms individually with each farmer. Three of the four grain elevator defendants included arbitration clauses in their contracts; Oberbeck Feed Co., the fourth, did not. Plaintiffs say that they were the victims of fraud, but fraud claims are person-specific. Who said what to whom and when, and who relied on which statements, are not things that can be resolved with respect to all farmers as a class.

Given an opportunity to respond to an earlier version of this opinion, plaintiffs

insisted that I should not discuss Rule 23 because they have not filed a motion for class certification. According to their memo, "Plaintiffs deferred filing a motion to certify until the motions to dismiss were [sic] decided." Plaintiffs apparently conceive of a Rule 23(b)(3) class action as a continuation of one-way intervention under former practice, which allowed plaintiffs to wait and see how the case turned out before deciding whether to extend the benefits of victory to a larger number of persons. Amendments to Rule 23 in 1966 make that a thing of the past.

■■ What the rule now says is: *"As soon as practicable* after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." Fed.R.Civ.P. 23(c)(1). Delay cannot be justified by the plaintiff's inactivity or strategic conduct. Identification of those who will be bound by the outcome precedes any decision on the merits. Moreover, Rule 23(e), which says that a class action cannot be "dismissed" without the court's approval, shows that representative litigants can't simply walk away from putative class members by the convenient device of failing to file a motion to certify—or by filing motions dismissing particular claims or defendants, as these plaintiffs have done profligately. None of those motions is (yet) effective, because, until the court has decided whether a case with a class allegation may proceed as a class action, any compromise or dismissal requires approval under Rule 23(e). See *Baker v. America's Mortgage Servicing, Inc.,* 58 F.3d 321, 324 (7th Cir.1995); *Glidden v. Chromalloy American Corp.,* 808 F.2d 621, 626 (7th Cir.1986); Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 7B *Federal Practice & Procedure* § 1797 (2d ed.1986).

When these plaintiffs filed a complaint with a class allegation, they acquired responsibilities to the absent farmers; their desire to shirk these responsibilities, their disregard of them by filing purported motions to dismiss, and their utter misconception of Rule 23, are further reasons why they cannot represent other farmers. But now that the case is securely *not* a class action, plaintiffs are free to dismiss claims and defendants to their hearts' content, and I grant all pending motions to dismiss. Any member of the putative class who was relying on this suit for protection must recognize that the statute of limitations is again running. *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); *Hemenway v. Peabody Coal Co.,* 159 F.3d 255, 265–66 (7th Cir.1998).

**III.**

Plaintiffs' federal claims all depend on the commodity futures laws. (Claims based on RICO were dropped in motions that have just been granted, and I therefore do not discuss them.) There are three categories of defendants. First come the grain elevators with which the farmers entered into flex HTA contracts. These merchants could be directly liable for violating the Commodity Futures Act. Only one merchant, Oberbeck Feed Company, remains an active party. (The others used contracts with arbitration clauses.) The second set of defendants contains Brighton Commodities, Inc., and Agro Systems Corporation. These firms provided advice *to plaintiffs* about how to market their grain. Plaintiffs say that Brighton and Agro gave bad (even fraudulent) advice by underestimating both the risk that prices would remain high and the counterparty credit risk (that is, the risk that the grain elevators would be unable or unwilling to bear interim losses and post the margin for the hedge positions). Claims against these defendants rest on state law. The third category of defendants has a single exemplar: ADM Investor Services, Inc. [ADMIS], which plaintiffs classify as the ringleader. ADMIS is a registered futures commission merchant, and plaintiffs contend that ADMIS promoted the use of flex HTA contracts in order to increase the demand for its services as a dealer in futures contracts.

Whether the flex HTAS are futures contracts is the centerpiece of the suit. If no, then plaintiffs have nothing but claims under state law. Defendants have moved to dismiss the federal claim under Rule 12(b)(6); plaintiffs seek partial summary judgment on it. Because characterization of the HTA agreements is an issue of law for reasons that I develop below, and because the legal principles can be applied to the allegations of the complaint without discovery, these two procedural routes come to the same thing. Defendants' motions to dismiss under Rule 12(b)(6) effectively respond to plaintiffs' motion for summary judgment, and vice versa. Perhaps what both sides really seek is a judgment on the pleadings under Rule 12(c). As all parties have had ample opportunity to make arguments pro and con, the time is ripe for decision. Maybe it is overripe: the basic question was argued to the court of appeals last February in *Lachmund*, so my decision may have a short half-life. But to accelerate disposition I will give my best view now.

At the outset I sketched the flex HTA arrangement; now it is time for a more thorough description—though still covering only the highlights. In a standard forward contract, the farmer promises to deliver a specified quantity of grain during a given month, and the grain merchant promises to pay either the market price at the time or a price set when the contract is signed. In the former arrangement the farmer bears the market risk, and in the latter the grain merchant bears it. Whichever side bears the risk may want to hedge—and hedging is easier if the delivery date and price are linked to futures markets. Thus the HTA contract. In this arrangement the farmer promises to deliver a specified quantity during a month that also is an expiration month for a futures contract (March, May, July, September, or December). The grain elevator promises to pay the price for which the futures contract is trading on the day the HTA is executed, plus or minus a basis adjustment. Because the contract price is fixed, the farmer is protected against price drops before delivery, and the grain merchant can protect itself against price rises by taking an offsetting short position in the futures market. The basis adjustment on delivery reflects the fact that the futures contract price is an end-of-month price at the delivery point (such as Chicago or Kansas City) specified in the contract. See Chicago Board of Trade, *Understanding the Basis—The Economics of Where and When* (1990). Cash grain early in the month may sell for a slightly different price than the end-of-month estimate reflected in the futures price; similarly there will be geographic differences reflecting transportation and storage costs. By deciding when during the month to deliver, the farmer may attempt to make the best of the basis difference between the HTA price and the futures price.

A flex HTA is a normal HTA plus an option to defer delivery. I use the word "defer" advisedly; the contract does not allow the farmer to cancel the obligation by buying an offsetting contract (a distinguishing feature of a futures market) or to pay cash in lieu of delivery. The farmer must deliver; only timing is open. (Plaintiffs say that Demeter, at least, orally agreed to bargain with farmers after the fact so that they could buy out their delivery obligations, and I accept this representation. Every contract similarly can be canceled by agreement, which may be contingent on a side payment. As Justice Holmes observed long ago, all a contract does is oblige the parties to perform or pay. The point here is that the HTA contract specifies delivery and cannot be unwound, as a standard futures position may be unwound, by buying an identical and offsetting contract in the market.)

Under a normal HTA the farmer's timing choice extends over a month; under a flex HTA it can extend over many months, even to the next growing season and beyond. Obviously the price for the cash commodity in the new delivery month will be different, and the grain merchant will have to roll its hedge to the new month to immun-

ize itself from price movements. An example may help to show how the process works. Suppose that in February 1995 a farmer contracts to deliver 100,000 bushels of corn in September 1995 for $2.50 per bushel, plus or minus a basis adjustment. The grain elevator sells futures contracts for the same delivery month, at the same price. When September arrives, the cash price is $3.50 per bushel. The grain elevator has accrued a profit of $100,000 ($1 per bushel) on the cash crop but has an unrealized loss of $100,000 in its futures position. Suppose that in September the farmer elects to defer delivery until December, and that the corn futures contract for December then is trading at $3.00 per bushel—a prediction that the cash price will fall, but not to the original level. The grain elevator anticipates that if the farmer delivers corn in December it will be worth $3.00 per bushel, a profit 50¢ per bushel less than if delivery were made in September. To preserve both parties' economic positions, the price for December delivery is adjusted from $2.50 per bushel to $2.00, so that again the grain elevator anticipates $100,000 profit from delivery to offset its hedging loss. The grain merchant then rolls the futures position from September to December. To do this the merchant must realize a 50¢ per bushel loss.

The need to realize losses in the futures markets, and to post additional margin if the futures contract price rises, is the source of the counterparty credit risk as the farmer sees things. From the grain merchant's position, there is a counterparty credit risk because the farmer may not deliver the grain in December, and then the merchant won't have a profit in the cash market to offset the losses in the futures market. Any forward contract has some counterparty credit risks: the farmer may not deliver; the elevator may go bankrupt. A flex HTA magnifies these risks, because the grain merchant may have to realize loss when rolling the hedge, or may be unable to post the margin if large price movements occur during the longer exposure to market risk. Similarly the farmer who sells the cash crop and defers delivery, anticipating that the price will fall, may be unable to cover and deliver if the price rises (or does not fall as much as the farmer anticipated).

Some farmers will perceive the flex HTA as a no-lose situation. If the price of grain falls before the delivery date, the farmer delivers and reaps the benefit of the price locked in months earlier. If the price of grain rises, the farmer defers delivery, sells the grain in the cash market (obtaining the higher price), and then continues to defer delivery until the price has returned to its original level, at which time the farmer covers in the market and delivers. It looks like the farmer gets the benefit of any price rise and is immune from price declines. But things that look too good to be true usually aren't true. Deferral under a flex HTA gives the farmer the economic equivalent of a short position, and a rising market can clobber the shorts. If the price rises before the original delivery, and then continues to rise, the farmer won't be able to cover and deliver. Deferral could lead to price adjustments that drive the eventual price to zero (or below). And even if the price of the cash crop falls, one or another of the counterparty credit risks may come to pass: either the farmer or the grain elevator may become overextended or insolvent before the process comes to a conclusion. In 1995–96 the price of corn rose and, much to the surprise of both farmers and grain merchants, kept on rising.

Many farmers and grain merchants defaulted on their commitments—though, from the looks of the litigation, farmers predominated among the defaulters. Under the law of contracts, the defaulting farmers must compensate the grain elevators for the difference between the contract price and the spot market price at the time delivery should have been made. What the farmers in these cases want me to do is to say that the flex HTA agreements really were futures contracts, making them invalid because futures contracts

must be traded by futures commission merchants on boards of trade.

The predominant judicial and administrative approach to this claim has been to assume that the flex HTAS are futures contracts unless they satisfy the statutory exception for forward contracts in 7 U.S.C. § 1a(11). Having made that assumption, neither the courts nor the CFTC have paid much attention to the language of § 1a(11); instead they have leapt to a long list of "factors" announced in *CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 577 (9th Cir.1982), which got its catalog from the legislative history.

Judges tend to emphasize, as the principal "factors," whether the transacting parties are in the cash-commodity business (as farmers and grain elevators obviously are) and whether delivery is anticipated (as it certainly is when prices fall, and generally is even when prices rise). The CFTC prefers a much longer list of "factors," such as whether the parties are commercially sophisticated and can bear extra risk, see *Statutory Interpretation Concerning Forward Transactions*, 55 Fed.Reg. 39188, 39191 (Sept. 25, 1990), and whether the transaction is designed in such a way that risk can be magnified before its completion. The ability to defer delivery to a future crop year can expose both parties to a flex HTA to substantial additional market and counterparty risk, which the CFTC finds significant. It insists that the actual terms of the contract be disregarded in order to investigate economic substance. In a brief as *amicus curiae* filed in *Lachmund*, the CFTC studiously avoided any concrete position on the flex HTA dispute but proclaimed that the distinction between futures and forward contracts depends on the parties' "primary purpose" and can't be determined without investigating both the parties' mental states and the course of their performance. In *Competitive Strategies for Agriculture* the Commission concluded that particular flex HTA contracts were futures, but only because most farmers did not in fact deliver for a particular commodity and crop year to a particular set of dealers, and even then only because delivery could be deferred across crop years and the Commission believed that the grain merchants had engaged in fraud. Because *Competitive Strategies for Agriculture* was settled, everything the CFTC said there was without the benefit of an adversarial presentation—and in cases such as *Lachmund*, where there has been adversarial development, the CFTC has been unwilling to essay an answer.

If I were to apply a multi-factor approach, I would be strongly inclined to the uniform judicial view that these are forward contracts. The flex HTA contracts were entered into between merchants, as part of the process by which farmers sold, and grain elevators acquired, their inventory. Plaintiffs do not deny that in other years they actually delivered grain under such contracts—indeed, that they delivered other crops, such as soybeans, under the same kinds of contracts for the 1995 and 1996 crop years. Farmers' ability to defer delivery is just that: a power to defer. The contract authorizes in advance what parties to contracts always can arrange by negotiation. Delivery dates are flexible, especially for agricultural commodities, which are subject to weather and other hazards. A flex HTA establishes the terms on which delay occurs. It may well be that farmers who elected to go short in a rising market made a blunder. If farmers were able to bear that kind of market price risk, why did they use fixed-price contracts in the first place? Erroneous business judgments many months after a contract was formed do not, however, change the nature of the contract from a forward to a future.

■ But I choose not to follow the multi-factor-balancing approach, either the judicial version under which the flex HTA agreements are covered by § 1a(11), or the administrative version under which it is impossible to tell even years after the fact whether § 1a(11) applies. Both get the cart before the horse. They assume that every contract for delivery in the future is

a "contract for future delivery" and therefore must be traded as a futures contract, and then turn to the exception in § 1a(11). This assumes that "contract for future delivery" has a lay rather than a technical meaning. Maybe so, but it is something to be established rather than assumed.

I conclude that the language has a technical reference—that the statute specifies the kind of contracts that trade in futures markets. Otherwise every executory contract is a "futures contract" within the exclusive domain of boards of trade (and the CFTC) unless it meets § 1a(11). Can that be right? What if there were no § 1a(11)? What if § 1a(11) read as it did until 1936 and were limited to deferred delivery of crops? (Compare the Grain Futures Act of 1922, 42 Stat. 998 (1922), with the Commodity Exchange Act of 1936, 49 Stat. 1491 (1936).) Then a contract to deliver heating oil in the winter would be a "futures contract," and only a futures commission merchant could be in the oil business! Can it be that until 1936 all commercial contracts for future delivery of newspapers, coal, ice, oil, gas, milk, bread, electricity, and so on were unlawful futures contracts? Surely the answer is no, which means that "contract for future delivery" must have a technical rather than a lay meaning.

Two other considerations impel me to reject the multi-factor approach. One is that this approach ignores the statutory text. Treating "delivery" (actual or intended) as the defining characteristic of a forward contract under § 1a(11) is implausible. Recall the definition of a futures contract: a "contract for future *delivery*." Every commodity futures contract traded on the Chicago Board of Trade calls for delivery of the commodity. Every trader has the right to hold the contract through expiration and to deliver or receive the cash commodity. Using "delivery" to differentiate between forward and futures contracts yields indeterminacy, because it treats as the dividing line something the two forms of contract have in common— not only in the statutory text but also in the commercial world. According to the Chicago Board of Trade, during 1998 some 131.1 million bushels of corn were delivered under corn futures contracts. That is about 1.6% of the total U.S. corn crop for the year, quite a respectable figure, which puts the lie to the commonly expressed belief that futures contracts rarely lead to delivery.

To separate futures from forwards it is necessary to recall the text of § 1a(11): "The term 'future delivery' does not include any sale of any cash commodity for deferred shipment or delivery." This language departs from the definition of a futures contract by emphasizing *sale* for *deferred* delivery. A futures contract, by contrast, does not involve a sale *of the commodity*. It involves a sale *of the contract.* In a futures market, trade is "in the contract." See *Dunn v. CFTC,* 519 U.S. 465, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997); *Chicago Mercantile Exchange v. SEC,* 883 F.2d 537, 542 (7th Cir.1989); *Board of Trade of City of Chicago v. SEC,* 187 F.3d 713, 715–16 (7th Cir.1999); Robert W. Kolb, *Understanding Futures Markets* (1987); Jerry W. Markham, *The History of Commodity Futures Trading and its Regulation* (1986).

In futures markets, people buy and sell contracts, not commodities. Terms are standardized, and each party's obligation runs to an intermediary, the clearing corporation. Clearing houses eliminate counterparty credit risk. Standard terms and an absence of counterparty-specific risk make the contracts fungible, which in turn makes it possible to close a position by buying an offsetting contract. All contracts that expire in a given month are identical; each calls for delivery of the same commodity in the same place on the same day. Forward contracts under § 1a(11), by contrast, call for sale of the commodity; no one deals "in the contract"; it is not possible to close a position by buying an offsetting position, because there are no fungible promises; delivery is idiosyncratic rather than centralized. *Co*

*Petro,* the case that invented the multi-factor approach, dealt with a fungible contract, see 680 F.2d at 579–81, and trading did occur "in the contract." That should have been enough to resolve the case.

My other reason for rejecting the multifactor-balancing approach is that it produces undesirable uncertainty—as the CFTC's tergiversation about flex HTA contracts demonstrates. It is essential to know *beforehand* whether a contract is a futures or a forward. The answer determines who, if anyone, may enter into such a contract, and where trading may occur. Contracts allocate price risk, and they fail in that office if it can't be known until years after the fact whether a given contract was lawful. Nothing is worse than an approach that asks what the parties "intended" or that scrutinizes the percentage of contracts that led to delivery *ex post*. What sense would it make—either business sense, or statutory-interpretation sense—to say that the same contract is either a future or a forward contract depending on whether the person obliged to deliver keeps his promise? Then the flex HTA agreements for soybeans in 1995 would be forward contracts, while the identically worded flex HTA contracts for corn would be futures contracts; the only difference would be that after the contracts were signed the price of corn rose and farmers elected to defer, while the price of soybeans did not and farmers elected to deliver. Such uncertainty is the worst possible outcome: it puts the grain elevators at the farmers' mercy (for if prices are stable or fall farmers deliver and keep the profit, while if prices rise the contracts become illegal), and effectively kills the market for forward contracts.

Any contention that it is appropriate to ignore the contract's form and focus on economic effects—here, that deferral can give the farmer the economic equivalent of a short position in the futures market—produces a sense of *déjà vu*. We've been here before, but in securities rather than commodities law. A business can be transferred two ways: the corporation may sell all of its assets, then liquidate and distribute to investors the cash received from the buyer; or the investors may sell their securities directly to the buyers. With sufficient care in drafting, these two forms may be made economically equivalent. This equivalence led to arguments that the sale of stock to transfer a whole business should not be regulated by the federal securities laws. Because the sale of assets would be governed by state contract law, it would upset expectations to handle the functionally equivalent transaction under federal law just because stock played a role. Many courts, including the Seventh Circuit, adopted this sale-of-business doctrine, see *Sutter v. Groen,* 687 F.2d 197 (7th Cir.1982), but the Supreme Court rejected it, ruling that form must be respected. See *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2312, 85 L.Ed.2d 692 (1985). One reason is that the securities laws are *about* form, and one can say much the same about the commodities laws. Another powerful reason was the need for certainty. The sale-of-business doctrine led to all sorts of questions. What if there were a significant minority shareholder? What if the new buyer did not plan to run the business as an entrepreneur? The list of questions turned out to be long, and the uncertainty considerable—just as the CFTC's list of factors has made it hard to determine when flex HTA agreements are futures contracts. By taking form seriously the Supreme Court was able to curtail, if not eliminate, that uncertainty and promote sensible business planning. See also *Reves v. Ernst & Young,* 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) (simplifying the approach to determining when notes are securities). Since the main battle in the sale-of-business cases was whether fraud litigation would occur in state or federal court, the Justices saw no reason for prolonged litigation about the forum: fraud is illegal in every state. So, too, for the choice between forward and futures contracts. Apart from the contention that the flex HTA agreements are "void," plaintiffs' principal substantive contention is that the grain

merchants, or their own advisers, deceived them. State courts are open to that argument; a long and expensive battle over whether the determination will be made by a federal court instead is not worth the candle.

Anyway, every proposition about economic equivalence can be turned around. Sure, the flex HTA arrangement allows farmers to take the same economic risk as being short in a futures market. But *every* short position entails that risk. Suppose an oil firm makes long-term commitments to deliver at a fixed price, expecting to find (or buy) the petroleum to cover that commitment. If the price rises, the firm will suffer an economic loss—not because such a promise is a "future" but just because it is short. Westinghouse, which entered into long-term uranium supply contracts for nuclear reactors it manufactured, suffered such a loss because it had expected to cover in the spot market, and the world price of uranium jumped because of a cartel. See *In re Westinghouse Electric Corp. Uranium Contracts Litigation*, 563 F.2d 992 (10th Cir.1977). No one doubts—at least, no one *should* doubt—that Westinghouse entered into forward contracts covered by § 1a(11) rather than futures contracts, even though at the time it promised delivery it did not own enough uranium to satisfy its obligations, and in the end it broke many of its promises to deliver. For Westinghouse and corn farmers alike, the market in the cash commodity delivered the penalty for selling short. Futures contracts *could* have been used to the same effect, but weren't. It is true that the flex HTA agreements gave farmers the return they could have obtained by being short in the futures market; but it is equally accurate to say that someone who dealt in futures obtained the return that was available to those who were short in the market for the cash commodity. Neither of these observations helps us to determine whether a given short position should be treated as a forward or a future.

■ Recognition that futures markets are characterized by trading "in the contract" leads to an easy answer for cases such as ours. Flex HTA agreements are not fungible; they can't be settled by buying offsetting positions; the trade is securely "in the commodity" rather than "in the contract." Cf. *Marine Bank v. Weaver*, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982) (a non-fungible contract that could not be traded on an exchange is not a security); *Giuffre Organization, Ltd. v. Euromotorsport Racing, Inc.*, 141 F.3d 1216 (7th Cir.1998) (a sports franchise linked to a single owner is not a security). To put this in statutory terms, I read "contract for future delivery" with an emphasis on "contract," and "sale of any cash commodity for deferred shipment or delivery" with an emphasis on "sale"; this adequately separates the domains of futures and forward transactions.

Another aspect of futures trading reinforces this conclusion. One distinguishing feature of futures markets is "futurity," which the Seventh Circuit discussed at length in *Chicago Mercantile Exchange.* Parties who enter futures contracts do not agree to pay the price that prevails when they buy the contracts; they agree to pay the price that prevails when the contracts *expire* (or the positions are closed by offsetting transactions). A contract for September corn, entered into in March, will fluctuate in price until September, when its final price is determined by the price of the cash commodity at the delivery point. That's what "futurity" means; the parties' ultimate obligation is not known until long after they buy the contracts. Futurity is why futures contracts can be used to hedge positions in the cash commodity. Flex HTA agreements lack futurity. The price the farmer is to receive on delivery is set when the contract is formed (and reset when delivery is deferred); the price of the market when the farmer delivers is irrelevant. That, indeed, is the point of these arrangements. The farmer transfers the market price risk to the grain merchant, who makes a *fixed* commitment to pay, and then hedges that commitment by selling a futures contract whose payoff

(or cost) will be determined in the future. A flex HTA with futurity would be worthless; it would be economically identical to selling in the spot market. The contract's value to the farmer is its protection against price declines; to provide that protection the contract cannot (and does not) have futurity. So it isn't a futures contract.

█ In reaching this conclusion I have given no deference to the CFTC's position. When deciding what is (or isn't) a "security," courts have not deferred to the SEC; I see no greater reason to defer to the CFTC when distinguishing between futures and forward contracts. In *Dunn* the Supreme Court addressed *de novo* the question whether a particular contract (an over-the-counter option on foreign currency) was excepted from the regulation of futures contracts. Likewise with the exception in § 1a(11). Perhaps *Dunn* could be distinguished on the ground that the exception, called the "Treasury Amendment," implied deference to its namesake, the Treasury Department (a possibility the Court mused about, 519 U.S. at 479 n. 14, 117 S.Ct. 913). But the central point is that deference usually depends on *delegation.* When Congress has told an agency to resolve a problem, then courts must accept the answer. When, however, the problem is to be resolved by the courts in private litigation—which is how this problem comes before me—the agency does not receive deference. *Adams Fruit Co. v. Barrett,* 494 U.S. 638, 649–50, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990). A judge always should pay careful heed to the agency's reasoning and give it the benefit of the doubt on technical matters. See *Atchison, Topeka & Santa Fe Ry. v. Peña,* 44 F.3d 437, 445–47 (7th Cir.1994) (en banc) (concurring opinion), affirmed, 516 U.S. 152, 116 S.Ct. 595, 133 L.Ed.2d 535 (1996). But the CFTC's reasoning is unpersuasive; it has assumed what is to be proven (that the flex HTA agreements are futures contracts) and left even the interpretation of the exception in § 1a(11) to the courts. The CFTC's opinions, statements, and *amicus* brief in *Lachmund,*

read more as an exegesis of *Co Petro* than as an independent analysis of the statutory or economic issues. Oddly, the CFTC has ignored the "futurity" question, despite its importance in the Seventh Circuit after *Chicago Mercantile Exchange.* Nothing is to be gained by parsing the CFTC's reasoning. Plaintiffs rely on *CFTC v. Schor,* 478 U.S. 833, 845–46, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), for the proposition that the CFTC should receive deference, but that case is not pertinent. The dispute in *Schor* was whether the CFTC could entertain state-law counterclaims in reparations proceedings. That dispute grew out of the CFTC's implementation of the law in an administrative forum. Nothing in. *Schor* contradicts the conclusion in *Adams Fruit* that when a given issue is handled by courts in private litigation, the agency should receive a respectful hearing but not deference. Courts do not "defer" to the FTC or the Antitrust Division about the meaning of the Sherman Act; just so with the meaning of futures and forward contracts.

One final note about § 1a(11). Norris, Davison & May propose in their Drake Law Review piece that courts treat the word "sale" in § 1a(11) as equivalent to "identified to the contract" under the Uniform Commercial Code. Then a contract would be a forward contract only if the seller actually *had* the goods at the time he promised to deliver them in the future. The authors conclude that all flex HTA agreements that allow postponement to a different crop year are outside § 1a(11). Like the CFTC's approach, this begs the question by assuming that all executory contracts other than those described in § 1a(11) must be futures contracts, a position that can't be right. *A* agrees to build a house for *B* (at a fixed or indexed price); is this a futures contract (and therefore void) because the house is not in existence? A middleman in the oil market offers tanker-loads of oil for sale, planning (if a sale is made) to buy a cargo on the high seas and divert the vessel to the customer's port. Again a futures contract, because the bro-

ker does not yet own ·the oil? Even the CFTC believes that such transactions are exempt under § 1a(11). See *Statutory Interpretation Concerning Forward Contracts, supra* (discussing 15–day Brent contracts to take North Sea oil); *Characteristics Distinguishing Cash and Forward Contracts and "Trade" Options,* 50 Fed.Reg. 39656 (Sept. 30, 1985). The relevant statutory language came into existence long before the UCC; "sale" under § 1a(11) serves a different function from identification to the contract under the UCC, and it would create a hornets' nest of problems to equate the two.

My conclusion that the flex HTA agreements are not contracts "for future delivery" also resolves plaintiffs' remaining federal claim: that Oberbeck violated 7 U.S.C. § 6d by acting as an unlicensed futures commission merchant. A futures commission merchant is a person "engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market". 7 U.S.C. § 1a(12)(A). Because the flex HTA agreements are not futures contracts, and because Oberbeck's activities are not "subject to the rules of any contract market", it was not required to register as a futures commission merchant.

## IV

With all claims based on federal law resolved, I relinquish supplemental jurisdiction under § 1367(c)(3). Discovery has not been held, and when the federal claim is eliminated early in the case it is almost always best to permit the parties to address their remaining differences in state court. Many such suits are already pending (suits in which the grain merchants are the plaintiffs, seeking damages for breach of contract). Only a decision to pursue an all-or-nothing resolution as part of a class action could justify retaining supplemental jurisdiction, but Part II of this opinion explains why class status is inappropriate. Relinquishing supplemental jurisdiction is the best course for substantially the same reasons class status is not.

## V

ADMIS has filed a motion for· sanctions under Fed.R.Civ.P. 11. The theory is that the complaint accused ADMIS of benefiting from HTA contracts by clearing the futures trades of the grain merchants, while plaintiffs' counsel knew, or easily could have learned, that none of the four grain elevator defendants trades futures through ADMIS. This motion has led to all sorts of collateral disputes, which I avoid by denying the motion on the ground of triviality.

Plaintiffs contended that ADMIS was liable for persuading both grain elevators and farmers to enter into HTA agreements that bolstered the demand for futures contracts. According to plaintiffs, the new demand came from farmers, not grain elevators; and each farmer-plaintiff had a futures trading account with ADMIS. Under the complaint's theory, ADMIS made more money as a result of HTA arrangements whether the farmers or the grain merchants did the trading. Supposedly ADMIS whipped up the demand through shills at introducing brokers; the complaint names Charles Nichols as an ADMIS agent who allegedly gave a seminar for farmers who sold grain to Oberbeck, touting the benefits of flex HTA contracts. This theory of liability does not depend on any of the grain elevators trading futures contracts through ADMIS, and the complaint does not (explicitly) assert that ADMIS traded any such contracts.

Well, ADMIS replies, the complaint *implies* that the grain merchants traded through ADMIS. This complaint is so long and vague that it implies lots of things; an overzealous reader might find implications about flying saucers. But a possible over-reading of a complaint is not sanctionable. What the complaint does allege—that the grain elevators traded futures contracts through dealers in Cook County, Illinois— is true. Likewise the assertion in the complaint that plaintiffs "entered into HTA contracts that were hedged with futures contracts either executed on the CBOT through [ADMIS] (directly or through its

[introducing brokers]) or used by [ADMIS] and its affiliates as part of their futures market activities." ADMIS reads this as an assertion that the grain elevators used its services; but plaintiffs treat it as an allegation that *they* traded futures contracts through ADMIS, in greater quantities than they would have done but for the HTA contracts.

■ Rule 11 does not demand that all possible readings of poorly drafted complaints be true. Although counsel have some responsibility to write their pleadings to avoid imposing unnecessary costs on adversaries, any implication that the grain merchants hedged their positions through ADMIS is trivial in the context of this case—and from the perspective of litigation expenses, too. ADMIS did not incur any substantial expense in dealing with this possible implication of the complaint. It submitted a two-page affidavit verifying that none of the four grain elevators named as defendants had traded futures through it; plaintiffs agree that this affidavit is correct. Awarding sanctions for a vague allegation that is so easily dealt with would go beyond allowing the tail to wag the dog. It would allow a flea to wag the dog.

Plaintiffs' allegations against ADMIS have many serious problems in addition to those covered in Part III. For example, why should the use of flex HTA contracts increase farmers' demand for transactions on futures markets? The point of the contracts is that farmers can obtain most economic equivalents of trading without actually executing futures transactions; the grain merchants do it for the farmers. In the absence of flex HTAS, farmers who wanted to bet that prices would fall (as these plaintiffs did) would be inclined to trade their own futures contracts; under the flex HTAS, all they had to do was defer delivery. There are also serious problems with the agency allegations in the complaint. Plaintiffs assert that ADMIS gave "specific approval" to Nichols' representations at an Oberbeck seminar in 1994, as a result of which the farmers used more

HTAS and traded more futures. Yet many of the materials plaintiffs offer to support this assertion are dated 1996 rather than 1994, and therefore could not have influenced the activities covered by the complaint. The supposed "specific approval" turns out to be hard to pin down; the only document to which plaintiffs point is a receipt for a copy of the materials, some distance from specific approval in advance of the presentation. And ADMIS believes that none of the plaintiffs attended the Oberbeck seminar in question, so it may be hard to establish causation.

■ These shortcomings might well have led to sanctions had ADMIS preserved a request for them, but it did not. Rule 11(c)(1)(A) requires a litigant seeking sanctions to serve privately—without a copy to the court—a motion that "shall describe the specific conduct alleged to violate subdivision (b)." The adversary then has 21 days to drop the allegation in order to avoid sanctions. ADMIS served such a motion, which was limited to the (inferred) allegation that the grain elevators traded futures through ADMIS. Because the motion must identify the "specific conduct" that violates Rule 11, ADMIS has not preserved any demand for sanctions based on other allegations of the complaint. Objections to these allegations were first raised in ADMIS's reply memorandum in support of its request for sanctions. By depriving plaintiffs of 21 days, following private notice, to correct their pleadings, ADMIS deprived itself of any opportunity to obtain a monetary award for these aspects of the allegations.

## VI

All of plaintiffs' pending motions to dismiss particular claims and defendants are granted, and these claims and defendants are dismissed.

Judgment will enter in favor of The DeLong Co. and against Brown in the amount of $100,437.50 plus interest from August 26, 1996.

Judgment will enter in favor of Staley Grain, Inc., and against Wilson Farm and associated persons in the amount specified by the National Feed and Grain Association (the details are too complex to be worth spelling out here).

Plaintiffs' federal claims against all other defendants that remain as parties after the various voluntary dismissals are terminated on the pleadings under Fed.R.Civ.P. 12(c), and plaintiffs shall take nothing by their complaint, except that the dismissal of all claims arising under state law is without prejudice to renewal in state court.

ADMIS's motion for sanctions under Rule 11, and all other pending motions, are denied. All five cases now are closed.

All defendants recover their costs and should file appropriate bills of costs.