# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-4245

COMMODITY FUTURES TRADING COMMISSION,

*Plaintiff-Appellant*,

v.

MICHAEL ZELENER, *et al.*,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 03 C 4346—**Matthew F. Kennelly**, *Judge*.

———————

PETITION FOR REHEARING AND
REHEARING EN BANC

———————

DECIDED OCTOBER 20, 2004

———————

Before FLAUM, *Chief Judge*, and POSNER, EASTERBROOK,
RIPPLE, MANION, KANNE, ROVNER, WOOD, EVANS, WILLIAMS,
and SYKES, *Circuit Judges*.

Plaintiff-appellant filed a petition for rehearing and
rehearing en banc on August 11, 2004. All of the judges on
the panel voted to deny rehearing. A judge called for a vote
on the petition for rehearing en banc, but a majority of the
active judges did not favor rehearing en banc. Accordingly,
the petition is denied.

RIPPLE, *Circuit Judge*, dissenting from the denial of rehearing en banc. This decision warrants the attention of the full court in an en banc proceeding. The analysis presented by the panel opinion cannot be squared with our prior precedent; it creates a conflict among the circuits; and it creates significant enforcement problems for the Commodity Futures Trading Commission ("CFTC").

Our earlier case law firmly establishes that this circuit, along with the other courts of appeals to have confronted the issue, employs the "totality of circumstances" approach to the determination of whether a contract is a futures contract.[1] *See Nagel v. ADM Investor Serv., Inc.*, 217 F.3d 436 (7th Cir. 2000); *Lachmund v. ADM Investor Serv., Inc.*, 191 F.3d 777 (7th Cir. 1999). We established this approach in *Lachmund* and *Nagel* in the context of hedge-to-arrive contracts for the sale of grain, which allowed the farmer to defer (rollover) his delivery obligations. In *Lachmund*, we recognized that

> Although cash forward contracts and futures contracts are easily distinguishable in theory, it is frequently difficult in practice to tell whether a particular arrangement between two parties is a bona fide cash forward contract for the delivery of grain or whether it is a mechanism for price speculation on the futures market. Our task, therefore, is to establish a methodology for determining whether a particular contract is a cash forward contract exempt from regulation under the CEA or a futures contract subject to the requirements of the CEA.

---

[1] The Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 et seq., regulates transactions involving contracts for the purchase or sale of a commodity for "future delivery," except "any sale of any cash commodity for deferred shipment or delivery," 7 U.S.C. § 1a(19). *See Lachmund v. ADM Investor Serv., Inc.*, 191 F.3d 777, 785-86 (7th Cir. 1999).

. . . .

[O]ur starting point must always be the words of the contract itself. The contract's terms will provide several indications of the nature of the transaction it memorializes. The document itself will reveal whether the agreement contemplates actual delivery, by indicating the following: whether the parties to the contract are in the business of producing or obtaining grain; whether the parties are capable of delivering or receiving actual grain in the quantities provided for in the contract; whether there is a definite date of delivery; whether the agreement explicitly requires actual delivery, as opposed to allowing delivery obligations to be rolled indefinitely into the future; whether payment takes place only upon delivery; and whether the contract's terms are individualized, as opposed to standardized.

. . . .

Indeed, because the CEA regulates transactions, it is often necessary to look beyond the written contract. *See* [*Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 319-20 (6th Cir. 1998)] (cautioning that "self-serving labels" that parties place on their contracts are not dispositive on the issue whether a contract is a cash forward or a futures contract); [*CFTC v. Co Petro Mktg. Group, Inc.*, 680 F.2d 573, 581 (9th Cir. 1982)] (noting that "no bright-line definition or list of characterizing elements is determinative"). In order to gain the fullest understanding possible of the parties' agreement and their purpose, we often must consider the course of dealings between the parties and the totality of the business relationship. *See id.* ("The transaction must be viewed as a whole with a critical eye towards its underlying purpose.").

*Lachmund*, 191 F.3d at 787. In *Nagel*, we refined the "totality of circumstances" approach and held that, when the

following circumstances are present, a contract will be deemed a forward contract: (1) the contract specifies individualized terms such as place of delivery and quantity, so that the contract is not fungible with other contracts for the sale of the commodity, except for cases in which the seller promises to offset the contract; (2) parties to the contract are industry participants contracting in the commodity rather than non-industry speculators trading for the contract's price; (3) delivery can not be deferred indefinitely. *Nagel*, 217 F.3d at 441. We noted that, if one or more of these features is missing, the contract may or may not be a futures contract. *Id.* The circuits that have addressed this question follow a similar approach. *See Grain Land Coop v. Kar Kim Farms, Inc.*, 199 F.3d 983, 990-92 (8th Cir. 1999); *Andersons*, 166 F.3d at 317-22; *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772-73 (9th Cir. 1995); *Co Petro*, 680 F.2d at 579-81.

The present case deals with speculative transactions for the sale or purchase of foreign currency; the contract called for settlement within forty-eight hours, however, every two days, the transaction was rolled forward and the customer maintained a position in an open currency market. The panel held that the rollover (indefinite delivery) did not convert these "spot" transactions into futures contracts. Slip Op. at 13.[2] The *approach* employed by the panel to reach that result departs substantially from our precedent.[3] It

---

[2]  A "spot" transaction is a transaction for the immediate sale and delivery of a commodity. A "cash forward" transaction, in contrast, refers to a transaction in which the commodity is presently sold but its delivery is, by agreement, delayed or deferred. *See Lachmund*, 191 F.3d at 786 (citing *Saloman Forex, Inc. v. Tauber*, 8 F.3d 966 (4th Cir. 1993)).

[3]  The present panel opinion describes the hedge-to-arrive contracts which were found not to be futures in *Nagel* and *Lachmund*
(continued...)

squarely rejects the relevance of delivery in the context of financial futures:

> Treating *absence* of "delivery" (actual or intended) as a defining characteristic of a futures contract is implausible. Recall the statutory language: a "contract of sale of a commodity for future *delivery*." Every commodity futures contract traded on the Chicago Board of Trade calls for delivery. Every trader has the right to hold the contract through expiration and to deliver or receive the cash commodity. Financial futures, by contrast, are cash settled and do not entail "delivery" to any participant. Using "delivery" to differentiate between forward and futures contracts yields indeterminancy, because it treats as the dividing line something the two forms of contract have in common for commodities and that both forms lack for financial futures.

Slip Op. at 7. Notably, the opinion does more than rely on a factual distinction between the speculative foreign currency transactions and hedge contracts for the sale of grain. It simply disagrees with the "totality of circumstances" approach employed in established law and, as the CFTC points out, engages in a debate with the approach set forth

---

[3] (...continued)

as allowing the farmers to roll their obligations indefinitely and thus to speculate on grain prices. Slip Op. at 4. However, in *Nagel* we found that delivery was *not* deferred forever, because the contract required the farmer to pay an additional charge every time he rolled the hedge. *See Nagel*, 217 F.3d at 436. The foreign currency transaction in the present case, in contrast, has no similar cost to rolling the transaction forward every two days. Based on this inaccurate analogy between the rollover features, the panel opinion concludes that "Rollover, and the magnification of gain and loss over a longer period, does not turn sales into futures contracts here any more than it did in *Nagel* and *Lachmund*." Slip Op. at 13.

in *Nagel. See* Petition of the CFTC at 5 n.2. Indeed, the panel opinion adheres closely to the view set forth in the district court in *Nagel. See Nagel v. ADM Investor Serv., Inc.*, 65 F. Supp. 740 (N.D. Ill. 1999) (Easterbrook, J., sitting by designation). After disparaging the analysis of *Co Petro*, 680 F.2d at 579-81,[4] the panel opinion then rebukes the "totality of circumstances" approach as a general matter:

> It is essential to know beforehand whether a contract is a futures or a forward. The answer determines who, if anyone, may enter into such a contract, and where trading may occur. Contracts allocate price risk, and they fail in that office if it can't be known until years after the fact whether a given contract was lawful. Nothing is worse than an approach that asks what the parties "intended" or that scrutinizes the percentage of contracts that led to delivery *ex post*. What sense would it make—either business sense, or statutory-interpretation sense—to say that the same contract is either a future or not depending on whether the person obliged to deliver keeps his promise? That would leave people adrift and make it difficult, if not impossible, for dealers (technically, futures commission merchants) to know their legal duties in advance. But reading "contract of sale of a commodity for future delivery" with an emphasis on "contract," and "sale of any cash commodity for deferred shipment or delivery" with an emphasis on "sale" nicely separates the domains of futures from other transactions.

Slip Op. at 6. Compare *Nagel*, 65 F. Supp. at 752. The panel in *Nagel*, acknowledging the concern, was not persuaded

---

[4]  The panel said that *Co Petro* "dealt with a fungible contract and trading did occur 'in the contract.' That should have been enough to resolve the case." Slip Op. at 8.

that the problem required the rejection of the totality of the circumstances test but rather its refinement. More precisely, it found "the problem of legal uncertainty under the 'totality of circumstances' is less serious than it appears to be." *Nagel*, 217 F.3d at 441.

The panel's opinion seizes on the statement in *Nagel* that the "'totality of circumstances' approach turns out in practice to give controlling significance to a handful of circumstances; and fortunately they can usually be ascertained just by reading the contract." *Id.* at 441. It then morphs that statement into the distortion that *Nagel* observed that in most cases "totality of circumstances" boils down to whether the trading is in fungible contracts. Slip Op. at 11. Consequently, the CFTC, the agency charged with the administration of the statute, justifiably is concerned that the panel's opinion will make application of the CEA (and CFTC's regulatory jurisdiction over futures contracts) solely hinge upon the concept of "fungibility" and whether fungibility is evident within the four corners of the contract. This restrictive view of the statute does not comport with *Nagel* and *Lachmund*'s recognized need to consider the full terms of an agreement in context. Again, *Nagel* recognized that fungibility is a key consideration—if the contract has idiosyncratic terms such as quantity or place of delivery, then the contract is not fungible. The panel opinion, however, conflates this consideration with the second factor of *Nagel*, that the parties are industry participants (e.g., farmers/grain elevator vs. a stockbroker) and, therefore, are trading in the commodity (forward contract), not in the price of the contract (futures contract). Slip Op. at 10.

Additionally, the CFTC asks that we rehear this matter to ensure uniformity of approach in an area of law in which the pronouncements of this circuit are particularly influential beyond the boundaries of our circuit. We need to hear this matter en banc and engage in thoughtful collegial deliberation before burdening the regulatory system with the

ambiguity created by the decision now before us. I respect-
fully dissent from the court's decision to let this ambiguity
stand.

**A true Copy:**
          **Teste:**


          _____

                    ***Clerk of the United States Court of***
                        ***Appeals for the Seventh Circuit***