*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0008p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

COMMODITY FUTURES TRADING COMMISSION,
                            *Plaintiff-Appellant,*

           *v.*                                              No. 06-3896

ROSS ERSKINE, et al.,
                            *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 04-00016—Christopher A. Boyko, District Judge.

Argued: July 25, 2007

Decided and Filed: January 9, 2008

Before: BATCHELDER and DAUGHTREY, Circuit Judges; ACKERMAN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Martin B. White, COMMODITY FUTURES TRADING COMMISSION, Washington, D.C., for Appellant. Brent L. English, LAW OFFICE OF BRENT L. ENGLISH, Cleveland, Ohio, for Appellees. **ON BRIEF:** Nancy R. Page, COMMODITY FUTURES TRADING COMMISSION, Washington, D.C., for Appellant. Brent L. English, LAW OFFICE OF BRENT L. ENGLISH, Cleveland, Ohio, for Appellees.

_____

## OPINION

_____

ALICE M. BATCHELDER, Circuit Judge. The Commodities Futures Trading Commission (CFTC) sued Ross Erskine and his company, Goros, LLC, (collectively "Goros") in federal court, alleging that Goros had misrepresented facts and omitted pertinent information when soliciting customers to trade in foreign currency, which violated the Commodity Exchange Act (CEA), 7 U.S.C. §§ 1-27. As a jurisdictional predicate, the CFTC alleged that the trades at issue were "futures contracts" governed by the CEA and that the CFTC is authorized to "enjoin or restrain violations" of that Act. *Id.* at § 13a-1. Goros denied the accusations, denied that the trades were "futures contracts," and challenged the CFTC's jurisdiction. The district court agreed with Goros as to the nature of the trades and the jurisdiction of the CFTC and granted summary judgment to Goros. The

---

[*] The Honorable Harold A. Ackerman, Senior United States District Judge for the District of New Jersey, sitting by designation.

1

CFTC appealed and we must now decide whether the trades at issue were "futures contracts" subject to the CFTC's jurisdiction. Because we conclude that they were not, we AFFIRM.

## I.

## A.

In 2001-2002, Goros sales representatives convinced 20 customers (with $472,822 in initial deposits) to open accounts with Goros and grant Goros power of attorney to trade foreign currency on their behalves. Goros traded through two registered "futures commission merchants" (FCMs) — Gain Capital, Inc. and FX Solutions — who conducted the trading via a "foreign currency exchange" ("forex") market. This forex market, which is central to this case, is not a public market, but is instead a "negotiated market," in which — according to the parties — foreign currency prices (the prices used for the trades in this case) are "constructed" by the FCMs using "software to process and distill currency prices offered by numerous banks and come up with an indicative market price."

In this FCM-created market, the FCMs offered unit-batches of currencies (e.g., 1,000 units or 100,000 units — units being foreign currency, e.g., £, ¥, ₣, €, etc.). But unit batches were not mandatory; they were offered only for transactional or bookkeeping convenience. The FCM's customers (e.g., Goros, on behalf of its 20 clients) were not restricted to buying pre-set batches; a customer could buy or sell currencies in any amounts of its choosing, including odd amounts (e.g., 7, 139, 25640, etc.). Importantly, the trading was in the actual currency, not in any paper representing a fungible unit batch of currency to be bought or sold at a later date.

The FCM's trading agreements stated: "Trader acknowledges that the purchase or sale of a currency always anticipates the accepting or making of delivery." So the actual, written agreement — as opposed to the subjective expectations of Goros, its clients, or any other FCM investor — provided for delivery of the foreign currency to actually occur, typically in accordance with the market convention of one or two days from the transaction (e.g., 48 hours). Of course, neither the investors nor the traders (Goros and the FCMs) actually wanted any foreign currency, so the practice was to roll over the balance every night and push the 48-hour delivery date forward indefinitely.

In carrying this construct (i.e., the imitation foreign currency market) to its logical end, the FCMs satisfied the transactions themselves, as "counter-parties." Goros would place an order (to buy or sell *X* units of foreign currency) with an FCM and the FCM would accept the order, but the FCM would not actually buy or sell any foreign currency. Instead, the FCM — using its computer-generated estimates of the market price (i.e., from its forex market) — would pretend the order had been filled (and later closed), and record the "transactions" in its system at the listed prices.

## B.

At the risk of oversimplifying, an example might be helpful. Let us say that Goros on behalf of a client, Lola, instructs the FCM to purchase 100 Chinese RMBs at $1 per RMB (to be sure, $1 per RMB is just this example's hypothetical price, taken from this example's hypothetical forex market, and has no relation to any real price, actual or forex). The FCM records 100 RMBs in Lola's account (i.e., Lola now "owns" 100 RMBs) and charges her $100,[1] but the FCM never

---

[1] In truth, the FCM would actually charge more than $100, because it would charge Goros a transaction fee, and Goros would charge Lola an additional transaction fee. Because the fees are irrelevant to this case, they are omitted from the example. They are mentioned here only to acknowledge that Goros and the FCMs actually make their money through these fees. In fact, "churning" (which the CFTC also accuses Goros of doing) is the act of trading excessively in order to create more of these transaction fees. The larger purpose of this footnote, however, is to address the CFTC's accusation that, because forex trading is a zero sum game, the only way for the FCMs to make money is for the investors to lose money. This accusation is false and, we think, disingenuous because the CFTC surely knows better.

actually purchases any RMBs, it just records "ownership" in her account. Then assume that the very next day the forex market is trading at $1.25 per RMB, so Goros instructs the FCM to sell the 100 RMBs. Again, the FCM doesn't actually "sell" any RMBs (which it never actually purchased), but merely credits Lola's account $125 and deletes the record of 100 RMBs from her account. In the span of a day, Lola has made $25 (less fees), by "trading foreign currency."

This could work the other way, too. Suppose that, on that first day, Goros, on behalf of another client, call him Lyle, instructs the FCM to sell 100 RMBs at $1 per RMB. The FCM records that Lyle "sold" 100 RMBs (which he doesn't have, but will have to "buy" at some point in the future to fulfill his side of the sale — i.e., a "short") and pays him $100, without ever actually selling any RMBs to anyone. But because the forex market trades at $1.25 per RMB the next day, Goros (fearful of further losses if the RMB keeps climbing in price) instructs the FCM to "buy" 100 RMBs and close out the short sale. Again, the FCM doesn't actually buy any RMBs (just as it never actually sold any), but merely evens up Lyle's account by deducting $125 and deleting the sale of the 100 RMBs. In the span of a day, Lyle has lost $25 (plus fees) trading foreign currency.

Notably, all this pretend trading occurred only in the commodity itself (i.e., the RMBs) — no contracts for purchase or sale were ever bought, sold, or traded. Neither Lola nor Lyle ever saw, let alone traded in, any standardized agreement, such as a typical option or futures contract. That is, Lola did not buy the "*right to purchase 100 RMBs for $100 at any time before date __,*" she just bought the RMBs. And Lyle did not purchase the "*right to sell 100 RMBs for $125 at any time before date __,*" he simply sold RMBs. Similarly, as there was no trading in any contract, there is no exchange in which such contracts would be traded. Clearly, the forex exchange is not such an exchange, it is a pretend exchange for the underlying commodity — so, as it turns out, there was not even a real exchange for the underlying commodity, there was only the construct used to inform the FCMs on the real-time price (though, it is undisputable that the FCMs *could have* purchased the foreign currency on the open market). Also, the agreements were not fungible, they were individual — Lola could have purchased any number of RMBs, just as Lyle could have sold any number of RMBs (there was no need, other than to simplify the math, for either transaction to involve exactly 100 RMBs). And the price was dictated by the market at the time of transaction. Finally, there was no designated time for closing the trade. Just as the district court found in the present case, the "transactions differed in price, amount and settlement date, unlike futures contracts where the contract must be liquidated at a fixed date determined at the time of purchase."

## C.

The CFTC emphasizes that none of the investors had any personal reason to actually acquire any foreign currency or even the ability to do so. Instead, the rollover provisions were invoked and the trades carried into the future indefinitely. Indeed, no foreign currency was ever actually acquired for any of these investors for any trade. Pointing to this fact — that the investors never actually owned the foreign currency — the CFTC exclaims that the only reason these investors purchased these foreign currencies was to speculate in the price changes. This is all true and undeniable.

---

Consider the absurdity of the CFTC's claim — that the FCMs only make money when the investors lose money — in light of the fact that numerous investors have all manner of positions (long, short, both), in all manner of currencies. Under the CFTC's theory, the FCMs would need the price of a foreign currency to go down if an investor were long in the currency but up if an investor were short in the currency, all without any way of knowing how the investors were going to invest. True, under the forex construct, the FCMs are taking money from the investors who are losing money on their foreign currency trades, but the FCMs give that money right back to any investors who are profiting on their trades. Such is the nature of a market. In this sense, it is akin to the bookmaker, who collects from losers and pays winners — traditionally, bookies do not bet on the games themselves, they attempt to even out the bets on both sides and make their money on the transaction fee involved in placing the bet. The same theory holds for the FCMs.

Goros moved for summary judgment on the basis that the CFTC has no jurisdiction over "forward contracts." Goros argued that the investors *could* request and receive the currency, if they so chose, based on the plain language of the Account Opening Agreements, and therefore, these contracts were actually "forward contracts." The CFTC replied that, because the investors had no (subjective) intention of ever receiving any foreign currency, but instead had the ability to offset their positions (as well as buy on margin), these "futures contracts." The district court, relying on the Seventh Circuit's *Zelener* decision, *see infra*, and the plain language of the Account Opening Agreements, agreed with Goros and granted its motion. The CFTC timely appealed.

## II.

Prior to 2000, the CFTC had no jurisdiction over off-exchange transactions in foreign currency. In 2000, however, Congress enacted the Commodity Futures Modernization Act amendments to the Commodity Exchange Act (hereafter referred to collectively as the "CEA"), which gave the CFTC jurisdiction over certain foreign exchange transactions, including those involving "futures contracts." The newly amended statute regulates "futures contracts," stating:

> This chapter applies to, and the Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that (i) is a contract of sale of a commodity for future delivery . . . and (ii) is offered to, or entered into with, a person that is not an eligible contract participant, unless the counterparty . . . of the person is . . . a futures commission merchant registered under this chapter[.]

7 U.S.C. § 2(c)(2)(B). But, as the Seventh Circuit declared upon considering this same provision, this broad language — "contract[s] of sale of a commodity for future delivery" — cannot reasonably be applied as broadly as it suggests. *See CFTC v. Zelener*, 373 F.3d 861, 865 (7th Cir. 2004).

> That language cannot sensibly refer to all contracts in which settlement lies ahead; then it would encompass most executory contracts. The Commission concedes that it has a more restricted scope, that it does not mean anything like 'all executory contracts not excluded as forward contracts by § 1a(19).' What if there were no § 1a(19)? Until 1936 that exemption was limited to deferred delivery of crops. Then until 1936 a contract to deliver heating oil in the winter would have been a 'futures contract,' and only a futures commission merchant could have been in the oil business! . . . Can it be that until 1936 all commercial contracts for future delivery of newspapers, magazines, coal, ice, oil, gas, milk, bread, electricity, and so on were unlawful futures contracts? Surely the answer is no, which means that 'contract for future delivery' must have a technical rather than a lay meaning.

*Id.* (citations omitted). Thus, the question to be answered in this appeal is whether, based on "a technical rather than a lay meaning," the trade at issue is a "futures contract" under the CEA.

### A.

The first issue we must resolve is whether we, as a court, are empowered to decide what constitutes a "futures contract," or if we must instead defer to the CFTC's formulation. After careful review of the arguments and the prevailing law, we find that the determination is ours to make.

The CFTC contends that its interpretation of what constitutes a "futures contract" is entitled to *Chevron* deference, *see Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), on the theory that: Congress authorized the CFTC to administer the CEA; the CEA governs "futures contracts"; and the CEA's definition of "futures contracts" is ambiguous. Goros makes three points in response. First, the CFTC waived any reliance on *Chevron* deference by failing to raise it to the district court. *See Help Alert W. Ky., Inc. v. TVA*, 1999 WL 775931, *3 (6th Cir. 1999)

("the plaintiffs advance their *Chevron* argument for the first time on appeal — and issues not raised before the district court generally may not be raised on appeal"). Next, "deference depends on delegation," Congress did not delegate this decision to the CFTC, and when "the problem is to be resolved by the courts in litigation — which is how this comes before us — the agency does not receive deference." *See Zelener*, 373 F.3d at 867. Finally, at no time since 2000, when Congress enacted the CEA amendments, has the CFTC ever defined "futures contract" by rule-making or in an adjudication, which would provide for *Chevron* deference, but has merely asserted its preferred definition during the course of litigation (and in a proposal to Congress for new legislation). This approach does not result in a definition entitled to *Chevron* deference. *See United States v. Mead*, 533 U.S. 218, 219 (2001) (acknowledging a need for "administrative formality").

We agree with Goros on each of its points and conclude that the CFTC is not entitled to *Chevron* deference on this issue. Under the present circumstances, we must decide what constitutes a "futures contract" and, consequently, decide whether CFTC has jurisdiction.

**B.**

We must next determine, then, what constitutes a "futures contract." Generally speaking, the CEA vests the CFTC with regulatory jurisdiction over "futures contracts" — putatively, "transactions involving contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). Expressly excluded from the term "future delivery," and therefore excluded from CFTC regulation, is "any sale of any cash commodity for deferred shipment or delivery," commonly referred to as a "forward contract." 7 U.S.C. § 1a(19). Drawing a distinction between futures contracts and forward contracts has proven difficult. The district court used the Seventh Circuit's "trade in the contract" test, *see Zelener*, 373 F.3d at 867, but the CFTC argues that it should have used a "totality of the circumstances" test, *see Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 317 (6th Cir. 1998). Based on the analysis and reasoning set forth below, we begin with the simplified distinction that a "futures contract" is a contract for a future transaction, while a "forward contract" is a contract for a present transaction with future delivery, and conclude with a specific definition for each.

**1.**

In 1982, the Ninth Circuit considered a claim by the CFTC that a company named Co Petro was unlawfully engaging in "futures contracts," under which Co Petro sold petroleum "at a fixed price for delivery at an agreed future date," but "did not require its customer to take delivery of the fuel." *CFTC v. Co Petro Mktg. Group, Inc.*, 680 F.2d 573, 576 (9th Cir. 1982).

> Instead, at a later specified date the customer could appoint Co Petro to sell the fuel on his behalf. If the cash price had risen in the interim Co Petro was to (1) remit the difference between the original purchase price and the subsequent sale price, and (2) refund any remaining deposit. If the cash price had decreased, Co Petro was to (1) deduct from the deposit the difference between the purchase price and the subsequent sale price, and (2) remit the balance of the deposit to the customer.

*Id*. Co Petro argued that the CFTC lacked jurisdiction over these trades because they were merely forward contracts, expressly excluded from CEA regulation. *Id*. at 576-77. The court explained:

> While [CEA] section 2(a)(1) provides the [CFTC] with regulatory jurisdiction over 'contracts of sale of a commodity for future delivery,' it further provides that the term future delivery 'shall not include any sale of any cash commodity for deferred shipment or delivery.' Cash commodity contracts for deferred shipment or delivery are commonly known as 'cash forward' contracts, while contracts of sale of a commodity for future delivery are called 'futures contracts.' The [CEA], however, sets forth no further definitions of the term 'future delivery' or of the phrase 'cash

commodity for deferred shipment or delivery.' The statutory language, therefore, provides little guidance as to the distinctions between regulated futures contracts and excluded cash forward contracts and, to our knowledge, no other court has dealt with this question. Where the statute is, as here, ambiguous on its face, it is necessary to look to legislative history to ascertain the intent of Congress.

*Id.* (citations and footnote omitted). The court discussed the history of the legislation and concluded that Congress intended "that a cash forward contract is one in which the parties contemplate physical transfer of the actual commodity." *Id*. at 578. Finding that the parties to the Co Petro agreements did not (subjectively) anticipate actual future delivery (even though the agreements did, objectively, provide for delivery if the purchasing party so chose), the court held that the forward contract "exclusion is unavailable to contracts of sale for commodities which are sold merely for speculative purposes and which are not predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future." *Id*. at 579.

The court also found that the contracts at issue were uniform, standardized agreements, readily facilitating trade in those agreements and offsets. *Id*. at 580. Similarly, Co Petro unilaterally set the prices according to the prevailing market rates, further facilitating trade and offsets in the agreements. *Id.* at 580-81. Ultimately, the *Co Petro* court held:

In determining whether a particular contract is a contract of sale of a commodity for future delivery over which the [CFTC] has regulatory jurisdiction by virtue of 7 U.S.C. § 2 (1976), no bright-line definition or list of characterizing elements is determinative. The transaction must be viewed as a whole with a critical eye toward its underlying purpose. The contracts here represent speculative ventures in commodity futures which were marketed to those for whom delivery was not an expectation. Addressing these circumstances in the light of the legislative history of the Act, we conclude that Co Petro's contracts are 'contracts of sale of a commodity for future delivery.' 7 U.S.C. § 2 (1976).

*Id*. This case became the standard for this issue and other courts followed along. Consequently, the prevailing rule, based on the *Co Petro* holding, focused on whether the putative purchaser had a subjective intention of actually receiving delivery of the underlying commodity — if so, it was deemed a "forward contract," but if not, it was deemed a "futures contract."

In 1995, the Ninth Circuit considered a claim by the CFTC that Nobel Metals was unlawfully engaging in "futures contracts," under which Nobel sold precious metals to customers who received title but directed that the actual metal be delivered to a third party. *CFTC v. Nobel Metals Int'l, Inc.*, 67 F.3d 766 (9th Cir. 1995). Relying on *Co Petro*, the court reasserted that the forward contract exclusion is unavailable for "contracts of sale for commodities sold merely for speculative purposes and which are not predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future." *Id*. at 772. The court went on:

To take advantage of the cash forward contract exclusion under the [CEA], the delivery requirement cannot be satisfied by the simple device of a transfer of title. As we said in *Co Petro*, 'a cash forward contract is one in which the parties contemplate physical transfer of the actual commodity.' If this were not so, the cash forward contract exception would quickly swallow the futures contract rule.

*Id*. The court concluded that there was no legitimate expectation that the customers would take actual delivery of the purchased metals, and deemed the contracts futures contracts while dismissing as irrelevant the "self-serving labels" that the defendants had given the contracts. *Id*. at 773.

In 1998, this Circuit considered claims by private parties, which turned on the question of whether certain grain contracts at issue were covered by the CEA and thereby subject to CFTC regulation. *Andersons*, 166 F.3d at 317. We explained:

‘Futures contracts’ are governed by the CEA and concomitantly, subject to CFTC regulations. ‘Futures contracts’ are contracts of sale of a commodity for future delivery. The term ‘future delivery,’ however, explicitly does not include any sale of any cash commodity for deferred shipment or delivery. Contracts falling under this latter definition are typically referred to as ‘cash forward’ contracts.

The purpose of this ‘cash forward’ exception is to permit those parties who contemplate physical transfer of the commodity to set up contracts that (1) defer shipment but guarantee to sellers that they will have buyers and visa versa, and (2) reduce the risk of price fluctuations, without subjecting the parties to burdensome regulations. These contracts are not subject to the CFTC regulations because those regulations are intended to govern only speculative markets; they are not meant to cover contracts wherein the commodity in question has an ‘inherent value’ to the transacting parties. We hold that in determining whether a particular commodities contract falls within the cash forward exception, courts must focus on whether there is a legitimate expectation that physical delivery of the actual commodity by the seller to the original contracting buyer will occur in the future.

*Id*. at 318 (quotation marks, citations, and footnotes omitted) (citing, among others, *Co Petro* and *Nobel Metals*). The *Andersons* opinion also includes a lengthy, but informative footnote, which quotes *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970-71 (4th Cir. 1993):

Because the CEA was aimed at manipulation, speculation, and other abuses that could arise from the trading in futures contracts and options, as distinguished from the commodity itself, Congress never purported to regulate ‘spot’ transactions (transactions for the immediate sale and delivery of a commodity) or ‘cash forward’ transactions (in which the commodity is presently sold but its delivery is, by agreement, delayed or deferred). Thus § 2(a)(1)(A) of the CEA, 7 U.S.C. § 2, provides that ‘futures’ regulated by the CEA do not include transactions involving actual physical delivery of the commodity, even on a deferred basis. Transactions in the commodity itself which anticipate actual delivery did not present the same opportunities for speculation, manipulation, and outright wagering that trading in futures and options presented. From the beginning, the CEA thus regulated transactions involving the purchase or sale of a commodity ‘for future delivery’ but excluded transactions involving ‘any sale of any cash commodity for deferred shipment or delivery.’ 7 U.S.C. § 2. The distinction, though semantically subtle, is what the trade refers to as the difference between ‘futures,’ which generally are regulated, and ‘cash forwards’ or ‘forwards,’ which are not.

A ‘futures contract,’ or ‘future,’ never precisely defined by statute, nevertheless has an accepted meaning which brings it within the scope of transactions historically sought to be regulated by the CEA.

It is generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed. To facilitate the development of a liquid market in these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce

a net profit or loss.  The main purpose realized by entering into futures transactions is to transfer price risks from suppliers, processors and distributors (hedgers) to those more willing to take the risk (speculators).  Since the prices of futures are contingent on the vagaries of both the production of the commodity and the economics of the marketplace, they are particularly susceptible to manipulation and excessive speculation.

In contrast to the fungible quality of futures, cash forwards are generally individually negotiated sales of commodities between principals in which actual delivery of the commodity is anticipated, but is deferred for reasons of commercial convenience or necessity.  These contracts are not readily transferable and therefore are usually entered into between parties able to make and receive physical delivery of the subject goods.

*Id.* at 318 n.14.

The *Andersons* opinion then explained the difference between "fixed price contracts" and "basis contracts," and restated its holding:  "contracts which contemplate actual physical delivery of a commodity are cash forward contracts and are therefore excluded from coverage by the CEA and CFTC regulations.  'Self-serving labels' that a party may choose to give its contracts, however, are not themselves dispositive of the futures/cash-forward question:  the ultimate focus is on whether the contracts in question contemplated actual, physical delivery of the commodity."  *Id.* at 319-20 (citations and footnote omitted).  Next, the *Andersons* court stated a multi-factor test (which the CFTC has seized upon in the present argument), adopted from a district court opinion:

In the well-reasoned opinion of *In re Grain Land Cooperative*, 978 F. Supp. 1267, 1273-74 (D. Minn. 1997), the district court listed the following factors in support of its finding that the [] contracts before it fit within the cash forward contract exclusion:  (1) the grain elevator (Grain Land) entered into these contracts only with farmers and producers of grain — not with speculators from the general public; (2) each plaintiff was a farmer in the business of growing grain and had the ability to make delivery on the contracts; (3) Grain Land was in the business of obtaining grain under contracts for resale and relied on actual delivery of that grain to carry out its business; (4) Grain Land had the capacity to take delivery of the grain subject to the [contract]s; (5) on their faces, the contracts were clearly grain marketing instruments, tools to accomplish the actual delivery of grain in exchange for money; (6) it was undisputed that delivery and payment routinely occurred between the parties in past dealings; and (7) the plaintiffs received cash payment on the contracts only upon delivery of the actual commodity.  We agree with the *Grain Land* Court that these characteristics exemplify the types of transactions that Congress intended to exclude from the CEA.

*Id.* at 320 (footnote omitted, citation form altered).  We then applied these seven factors — six of which merely support the test's critical factor that actual delivery was (subjectively) contemplated, *see id.* at 321 n.20 — to conclude that, in *Andersons*, the "contracts fit within the cash forward contract exclusion to the CEA and fall outside of CFTC regulation."  *Id.* at 322.

In 2000, Congress amended the CEA (via the Modernization Act) to add certain commodities to the CFTC's jurisdiction, including — under certain conditions — foreign currency.  While this new law, at least on the surface, renders the preceding cases distinguishable, the amendment's language about futures/forwards is the same as the pre-existing CEA language, so the reasoning of those prior cases remains pertinent.  Indeed, it was not the CEA amendment that shifted the futures/forwards pedestal off its foundation, but rather the Seventh Circuit's fresh look at it in 2004.

**2.**

In 2004, the Seventh Circuit considered a claim by the CFTC that Michael Zelener was unlawfully engaging in "futures contracts," under which Zelener sold foreign currency to casual speculators without any intent by those speculators ever to receive possession of the foreign currency. *CFTC v. Zelener*, 373 F.3d 861, 862 (7th Cir. 2004), petition for reh'g en banc denied; *but see* 387 F.3d 625 (Ripple, J., dissenting from denial of reh'g en banc). Factually, the case is particularly on point with the present case, as the district court noted. The *Zelener* facts include:

> A customer could purchase (go long) or sell (short) any currency; for simplicity we limit our illustrations to long positions. The customer specified the desired quantity, with a minimum order size of $5,000; the contract called for settlement within 48 hours. It is agreed, however, that few of [Zelener]'s customers paid in full within that time, and that none took delivery. AlaronFX [i.e., the FCM] could have reversed the transactions and charged (or credited) customers with the difference in price across those two days. Instead, however, AlaronFX rolled the transactions forward two days at a time — as the AlaronFX contract permits, and as [Zelener] told the customers would occur. Successive extensions meant that a customer had an open position in foreign currency. If the dollar appreciated relative to that currency, the customer could close the position and reap the profit in one of two ways: take delivery of the currency (AlaronFX promised to make a wire transfer on demand), or sell an equal amount of currency back to AlaronFX. If, however, the dollar fell relative to the other currency, then the client suffered a loss when the position was closed by selling currency back to AlaronFX.
>
> The CFTC believes that three principal features make these arrangements 'contracts of sale of a commodity for future delivery': first, the positions were held open indefinitely, so that the customers' gains and losses depended on price movements in the future; second, the customers were amateurs who did not need foreign currency for business endeavors; third, none of the customers took delivery of any currency, so the sales could not be called forward contracts, which are exempt from regulation under 7 U.S.C. § 1a(19). This subsection reads: 'The term 'future delivery' in § 2(a)(1)(A) does not include any sale of any cash commodity for deferred shipment or delivery.' Delivery never made cannot be described as 'deferred,' the Commission submits. The district court agreed with this understanding of the exemption but held that the transactions nonetheless were spot sales rather than 'contracts . . . for future delivery.' Customers were entitled to immediate delivery. They could have engaged in the same price speculation by taking delivery and holding the foreign currency in bank accounts; the district judge thought that permitting the customer to roll over the delivery obligation (and thus avoid the costs of wire transfers and any other bank fees) did not convert the arrangements to futures contracts.

*Id*. at 863-64 (edits omitted). The *Zelener* court then offered its definition of futures contract:

> A futures contract, roughly speaking, is a fungible promise to buy or sell a particular commodity at a fixed date in the future. Futures contracts are fungible because they have standard terms and each side's obligations are guaranteed by a clearing house. *Contracts are entered into without prepayment, although the markets and clearing house will set margin to protect their own interests. Trading occurs in 'the contract,' not in the commodity.* Most futures contracts may be performed by delivery of the commodity (wheat, silver, oil, etc.). Some (those based on financial instruments such as T-bills or on the value of an index of stocks) do not allow

> delivery. Unless the parties cancel their obligations by buying or selling offsetting positions, the long must pay the price stated in the contract (e.g., $1.00 per gallon for 1,000 gallons of orange juice) and the short must deliver; usually, however, they settle in cash, with the payment based on changes in the market. If the market price, say, rose to $1.50 per gallon, the short would pay $500 (50¢ per gallon); if the price fell, the long would pay. The extent to which the settlement price of a commodity futures contract tracks changes in the price of the cash commodity depends on the size and balance of the open positions in 'the contract' near the settlement date.

*Id.* at 864 (quoting *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 542 (7th Cir. 1989)) (emphasis added). From this, the court reasoned: "These transactions could not be futures contracts under that definition, because [1] the customer buys foreign currency immediately rather than as of a defined future date, and [2] because the deals lack standard terms. AlaronFX buys and sells as a principal; [3] transactions differ in size, [4] price, and [5] settlement date. The contracts are not fungible and thus [6] could not be traded on an exchange." *Id.* The CFTC disagreed.

In reply, the CFTC argued that because AlaronFX rolled forward the settlement times, the transactions were for future delivery in practice even though not in form, and therefore, fixed expiration dates and fungibility were irrelevant. *Id.* The CFTC favored a multi-factor inquiry with emphasis on "whether the customer is financially sophisticated, able to bear risk, and intended to take or make delivery of the commodity." *Id.* But, the Seventh Circuit refuted this, explaining:

> Yet such an approach ignores the statutory text. *Treating absence of 'delivery' (actual or intended) as a defining characteristic of a futures contract is implausible.* Recall the statutory language: a 'contract of sale of a commodity for future delivery.' Every commodity futures contract traded on the Chicago Board of Trade calls for delivery. Every trader has the right to hold the contract through expiration and to deliver or receive the cash commodity. Financial futures, by contrast, are cash settled and do not entail 'delivery' to any participant. *Using 'delivery' to differentiate between forward and futures contracts yields indeterminacy, because it treats as the dividing line something the two forms of contract have in common for commodities and that both forms lack for financial futures.*

*Id.* at 865 (emphases added). Furthermore:

> It is essential to know beforehand whether a contract is a futures or a forward. The answer determines who, if anyone, may enter into such a contract, and where trading may occur. Contracts allocate price risk, and they fail in that office if it can't be known until years after the fact whether a given contract was lawful. *Nothing is worse than an approach that asks what the parties 'intended' or that scrutinizes the percentage of contracts that led to delivery ex post.* What sense would it make — either business sense, or statutory-interpretation sense — to say that the same contract is either a future or not depending on whether the person obliged to deliver keeps his promise? That would leave people adrift and make it difficult, if not impossible, for dealers (technically, futures commission merchants) to know their legal duties in advance.

*Id.* at 866 (emphasis added). Thus, the Seventh Circuit — without express mention of the cases — refuted as insupportable the "anticipation of delivery" theory espoused by *Co Petro*, *Nobel Metals*, and *Andersons*. First, the purported difference — whether or not delivery was actually anticipated— is, in reality, no difference at all because delivery is *always* (at least facially) promised for tangible commodities and *never* for intangibles, regardless of whether it is a future or a forward. Second, this approach relies on a subjective theory of contracts, in which a court must look to the parties'

subjective expectations and anticipations (e.g., whether delivery is actually desired) and ignore the objective language of the contract (e.g., where delivery is expressly provided for).

The Seventh Circuit instead offered a different distinction. "A futures contract . . . does not involve a sale of the commodity at all. It involves a sale of the contract. In a futures market, trade is 'in the contract.'" *Id.* at 865 (citations omitted). Thus, the *Zelener* court explained:

> In organized futures markets, people buy and sell contracts, not commodities. Terms are standardized, and each party's obligation runs to an intermediary, the clearing corporation. Clearing houses eliminate counterparty credit risk. Standard terms and an absence of counterparty-specific risk make the contracts fungible, which in turn makes it possible to close a position by buying an offsetting contract. All contracts that expire in a given month are identical; each calls for delivery of the same commodity in the same place at the same time. Forward and spot contracts, by contrast, call for sale of the commodity; no one deals 'in the contract'; it is not possible to close a position by buying a traded offset, because promises are not fungible; delivery is idiosyncratic rather than centralized. *Co Petro*, the case that invented the multi-factor approach, dealt with a fungible contract and trading did occur 'in the contract.' That should have been enough to resolve the case.

*Id.* at 865-66 (internal citation omitted).

> Recognition that futures markets are characterized by trading 'in the contract' leads to an easy answer for most situations. Customers of foreign exchange at AlaronFX did not purchase identical contracts: each was unique in amount of currency (while normal futures contracts are for fixed quantities, such as 1,000 bushels of wheat or 100 times the price of the Standard & Poors 500 Index) and in timing (while normal futures contracts have defined expiration or delivery dates). Thus the trade was 'in the commodity' rather than 'in the contract.'

*Id.* at 867. The Seventh Circuit concluded that "[t]hese [foreign currency] transactions were, in form, spot sales for delivery within 48 hours. Rollover, and the magnification of gain or loss over a longer period, does not turn sales into futures contracts here." *Id.* at 869.

**3.**

In the present case, the district court found "no dispute that the contracts entered into by customers with the FCMs [] purported to be spot transactions on their face." *CFTC v. Erskine*, No. 1:04CV16, 2006 WL 1050677, *3 (N.D. Ohio, Apr. 19, 2006). Applying the *Zelener* reasoning to the facts at hand, the district court concluded:

> Ultimately, this [*Zelener*] view comports with this Court's opinion that the form of the contract, and not the intent, should be determinative. It is disingenuous for customers to allege an intent to engage in futures transactions without taking delivery when the plain language of the agreements they signed expressly states the transactions are spot transactions and the parties may take delivery of the commodity.

*Id.* at *6; *see also id.* at *5 ("the intent to speculate does not abrogate the clear contract language anticipating possible delivery"). The district court reasoned:

> [T]his Court does not find that rolling over or offsetting of spot transactions converts them to futures contracts. The evidence before the Court demonstrates that the contracts purchased were bought at a price determined by the market at the time of

the purchase and were sold, not for some fixed price in the future, but at the market price at the time of the sale or offset. Likewise, the *Zelener* Court found the transactions before it, 'were liquidated not on the basis of a value determined at the time of contracting, but at a market value determined at the time of sale.' This salient point was critical in differentiating a futures contract from spot transactions.

*Id.* at *5 (quotation marks and citations omitted). Finally, the district court noted: "as customers could keep positions open through rollovers, take delivery or sell back to the FCM the currency, the customers' transactions differed in price, amount and settlement date, unlike futures contracts where the contract must be liquidated at a fixed date determined at the time of the purchase." *Id.* at *6.

In response to the CFTC's argument that the district court was obliged to follow the *Andersons* "totality of the circumstances" test rather than the *Zelener* "trade in the contract" test, the district court explained:

> The Court finds the *Zelener* decision to be of more practical guidance since its facts and issues mirror the claims by Plaintiff in the case before this Court. Furthermore, the *Anderson's* case preceded the Modernization Act by nearly two years; dealt with grain and not foreign currency; and involved 'cash forward contracts,' not spot transactions. Even assuming *Anderson's* has more relevant application, this Court finds that *Anderson's* is not inconsistent with *Zelener*, nor does it compel a different conclusion. In addition, the Court recognizes the Seventh Circuit's expertise in analyzing transactions in commodities, as its' jurisdiction encompasses the Chicago Mercantile Exchange, the world's largest financial exchange.

*Id.* at *3. With all due respect to the Seventh Circuit, we cannot agree that its presumptive expertise in the commodities field would justify either this court's (or a district court sitting in this circuit) choosing Seventh Circuit reasoning over our controlling precedent. We do, however, agree that *Andersons* is distinguishable — on the distinction between tangible and intangible commodities, inasmuch as there is never "delivery" of intangible or financial commodities — and *Andersons*'s reasoning does not support its outcome any better than the present reasoning would. Since the present reasoning — and holding — would support the same outcome as was reached in *Andersons*, and the present reasoning also considers intangibles (i.e., the Modernization Act aspects) and the *Zelener* decision, we find the present reasoning superior to *Andersons* and concede that *Andersons* does not provide controlling precedent.

Therefore, we conclude that a futures contract is a contract for a future transaction, while a forward contract is a contract for a present transaction with future delivery. Of course, there is more to the distinction than this one-line generalization; we still need an actual definition.

### 4.

Much has been made in the case law — and by the parties to this appeal — of Congress's failure to define a "futures contract" expressly, in either the original Commodity Exchange Act or its amendment, the Commodity Futures Modernization Act of 2000. But, this does not mean that the term "futures contract" is undefined. On the contrary, many pertinent sources have defined "futures contract," in terms that investors and traders are expected to (and do) rely upon, and it is reasonable to surmise that regulators — other than the CFTC, apparently — would rely on similar definitions, even without express codification in a federal statute. Although each differs slightly from the others, the definitions, considered altogether, exhibit a consistent theme and typically include six common elements. Based on our consideration of these numerous lay definitions, we find that, in common parlance, "futures contract" means:

(1) the "contract" is standardized so that it can be traded on an exchange, and is

    (2)  a fungible agreement to buy or sell
    (3)  a stated unit quantity of
    (4)  a stated commodity
    (5)  at a stated unit price
    (6)  at or before a stated future time.

*See*, *e.g.*, Merriam-Webster's Dictionary of Law (contract), *available at* http://dictionary.reference. com/browse/contract (last accessed Jan. 3, 2008).[2]   It is important to recognize that it is the

---

[2]Numerous sources define "futures contract," all of which include most, if not all, of the foregoing six elements. For example, Black's Law Dictionary defines "futures contract" as:

> [1] an agreement to buy or sell [2] a standardized [3] asset (such as a commodity, stock, or foreign currency) [4] at a fixed price [5] at a future time, usually during a particular time of a month. • [6] Futures contracts are traded on exchanges such as the Chicago Board of Trade or the Chicago Mercantile Exchange.

Black's Law Dictionary (8th ed. 2004) (futures contract).

The Chicago Mercantile Exchange website includes a "glossary of terms," which defines "futures contracts" as:

> [1] an obligation to deliver or to receive [2] a specified quantity and grade of [3] a commodity [4] during a designated month [5] at the designated price.  Each futures contract is [6] standardized and specifies commodity, quality, quantity, delivery date and settlement.

CME Glossary, *available at* http://www.cme.com/glossary/F.html (last accessed Jan. 3, 2008).

The Chicago Board of Trade website includes a "glossary," which defines "futures contract" as:

> A legally binding agreement, [1] made on the trading floor of a futures exchange, [2] to buy or sell a commodity or financial instrument sometime in the future.  Futures contracts are standardized according to the quality, [3] quantity, and [4] delivery time and location for each [5] commodity.  The only variable is [6] price, which is discovered on an exchange trading floor.

CBOT Glossary, *available at* http://www.cbot.com/cbot/pub/page/0,3181,1059,00.html#F (last accessed Jan. 3, 2008).

The Chicago Board of Options Exchange website includes an "options dictionary," which defines "futures contract" as a:

> [1] standardized [2] contract calling for the delivery of [3] a specified quantity [4] of a commodity [5] at a specified date in the future.

CBOE Dictionary, *available at* http://www.cboe.com/LearnCenter/Glossary.aspx#F (last accessed Jan. 3, 2008).

A search of dictionary.com for "futures contract" turns up four (4) more results:

> Futures Contract – [1] An agreement to buy or sell [2] a specific amount [3] of a commodity or financial instrument [4] at a particular price [5] on a stipulated future date; the contract can be sold before the settlement date.

WordNet 3.0 (futures contract), Princeton Univ., *available at* http://dictionary.reference.com/browse/futures contract (last accessed Jan. 3, 2008).

> Futures Contract – A contractual agreement, generally [1] made on the trading floor of a futures exchange, [2] to buy or sell [3] a particular commodity or financial instrument [4] at a pre-determined price [5] in the future. Futures contracts detail the quality and [6] quantity of the underlying asset they are standardized to facilitate trading on a futures exchange.  Some futures contracts may call for physical delivery of the asset, while others are settled in cash.

Investopedia.com (futures contract), Investopedia Inc., *available at* http://dictionary.reference.com/browse/futures

*agreement* or *contract* that is traded on an exchange.  It is unremarkable (though easily enough mistaken as relevant) that the underlying commodity is also traded on a market exchange.

The alternative concept, i.e., "forward contract," is also defined by numerous sources, often with an emphasis on distinguishing it from a "futures contract."  A "forward contract" is:

(1)  neither standardized nor traded on an exchange, and is
(2)  an individual agreement to buy or sell
(3)  some agreed-upon quantity of
(4)  some commodity
(5)  at some agreed-upon price
(6)  at some agreed-upon time in the future.

*See*, *e.g.*, Merriam-Webster's Dictionary of Law (contract), *available at* http://dictionary.reference. com/browse/contract (last accessed Jan. 3, 2008).[3]  Thus, with a "forward contract," the underlying

---

 contract (last accessed Jan. 3, 2008).

> Futures Contract – [1] An agreement to take (that is, by the buyer) or make (that is, by the seller) delivery of [2] a specific commodity [3] on a particular date.  The commodities and contracts are [4] standardized in order that an active resale market will exist.  Futures contracts are available for a variety of items including grains, metals, and foreign currencies.

Wall Street Words (futures contract), Houghton Mifflin Co., *available at* http://dictionary.reference. com/browse/futures contract (last accessed Jan. 3, 2008).

> Futures Contract – A contract [1] purchased or sold on an exchange in which [2] a party agrees to buy or sell [3] a quantity [4] of a commodity [5] on a specified future date [6] at a set price.

Merriam-Webster's Dictionary of Law (contract), Merriam-Webster, Inc., *available at* http://dictionary.reference.com/ browse/contract (last accessed Jan. 3, 2008).

[3]Almost every source to define "futures contract" also offers an off-setting definition of "forward contract." Black's Law Dictionary defines "forward contract" as:

> [1] An agreement to buy or sell [2] a particular nonstandardized asset (usually currencies) [3] at a fixed price [4] on a future date. • Unlike a futures contract, a forward contract is [5] not traded on a formal exchange. -- Also termed forward agreement.

Black's Law Dictionary (8th ed. 2004) (contract).

> The Chicago Mercantile Exchange website defines a "forward contract" as:

> A private, cash-market [1] agreement between a buyer and seller [2] for the future delivery [3] of a commodity [4] at an agreed price.  In contrast to futures contracts, forward contracts are [5] not standardized and not transferable.

CME Glossary of Terms, *available at* http://www.cme.com/glossary/F.html (last accessed Jan. 3, 2008).

> The Chicago Board of Trade website defines a "forward contract" as:

> A cash contract in which [1] a seller agrees to deliver [2] a specific cash commodity to a buyer [3] sometime in the future.  Forward contracts, in contrast to futures contracts, are [4] privately negotiated and are not standardized.

CBOT Glossary, *available at* http://www.cbot.com/cbot/pub/page/0,3181,1059,00.html#F (last accessed Jan. 3, 2008).

> A search of dictionary.com turned up three (3) more results:

> Forward Contract – A cash [1] market transaction in which delivery of the [2] commodity is deferred until after the contract has been made.  Although the [3] delivery is made in the future, [4] the price is determined on the initial trade date.  Investopedia Commentary:  Most forward contracts [5] don't have standards and [6] aren't traded on exchanges.  A farmer would use a forward contract to 'lock-in'

commodity is typically traded on a market exchange (as it typically is with a "futures contract" as well), but the *agreement* or *contract* itself is neither standardized nor traded on an exchange.

Notably, none of these definitions/distinctions (*see* fn. 2 and 3) makes any mention of any anticipation of actual delivery (or lack there of). This is simply not a practical distinction. Instead, the distinction — as commonly understood — turns on the standardization and fungibility of the contract, and as the Seventh Circuit suggested, whether there is "trading in the contract," rather than trading only in the underlying commodity.

## C.

The final issue we must resolve is whether the foreign currency transactions *in this case* were "futures contracts." Because we find from the analysis that follows that they were not, we must also conclude — as did the district court — that the CFTC did not have jurisdiction under the CEA.

The district court found "no dispute that the contracts entered into by customers with the FCMs [] purported to be spot transactions on their face," *Erskine*, 2006 WL 1050677 at *3, and "the customers' transactions differed in price, amount and settlement date, unlike futures contracts where the contract must be liquidated at a fixed date determined at the time of the purchase." *Id*. at *6. Indeed, in looking at each of the six elements identified above, we agree that the transactions in the present case have all the elements of a "forward contract" and none of a "futures contract."

One: the agreement was not traded on an exchange — i.e., the investor could not call just any broker and say, "*I want to buy (sell) that future contract, as listed on the exchange under the symbol __.*" Two: the agreement was not fungible, it was a specific order of a specific commodity. Three: the transaction was not bound to a stated unit quantity — i.e., the investor could not simply say, "*I want to buy ___ number of those listed futures contracts*," each representing a sized lot of [100 or 1,000 or 10,000, etc.] units of the individual commodity. Four: the "contract of sale" did not already state the particular commodity. Five: the contract did not have a set price independent of the market price, which would create an opportunity to exploit the difference between the futures contract price and the market price. And, six: the price was not related to a stated date, on which the contract would necessarily come due.

Therefore, the foreign currency transactions in this case were not futures contracts.

## III.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

a price for his grain for the upcoming fall harvest.

Investopedia.com (forward contract), *available at* http://dictionary.reference.com/browse/forward contract (last accessed Jan. 3, 2008).

> Forward Contract – [1] An agreement between two parties to the sale and purchase [2] of a particular commodity [3] at a specific future time. Although forward contracts are similar to futures, [4] they are not easily transferred or canceled. Thus, they are not liquid.

Wall Street Words (forward contract), *available at* http://dictionary.reference.com/browse/forward contract (last accessed Jan. 3, 2008).

> Forward Contract – [1] A privately negotiated [2] investment contract in which a buyer commits to purchase something ([3] as a quantity [4] of a commodity, security, or currency) [5] at a predetermined price [6] on a set future date.

Merriam-Webster's Dictionary of Law (contract), *available at* http://dictionary.reference.com/ browse/contract (last accessed Jan. 3, 2008).