**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0345n.06

No. 16-1951

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Jun 19, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| JERRY STAUFFER, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: SILER, McKEAGUE, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Jerry Stauffer was convicted by a jury of one count each of wire fraud, in violation of 18 U.S.C. § 1343, and money laundering, in violation of 18 U.S.C. § 1957, in connection with a foreign-currency-exchange (forex) Ponzi scheme, and was sentenced to two 120-month concurrent sentences. His sentencing guidelines included a commodities-law enhancement and an obstruction-of-justice adjustment. He now appeals, arguing that the district court abused its discretion in denying him Criminal Justice Act (CJA) funds to hire a digital-forensic expert, and challenging the procedural reasonableness of his sentences. Finding neither an abuse of discretion in the denial of CJA funds nor procedural error in sentencing, we **AFFIRM**.

**I**

Stauffer was a resident of Traverse City, Michigan, where he operated a boat-brokerage business and represented himself as a forex expert. Between 2009 and 2015, he accepted

investments from a number of persons in western Michigan to trade on the forex market; in return, Stauffer was to receive a share of the trading profits. Investors received monthly brokerage statements showing that Stauffer was trading with their money as promised, and, in several cases, that their investments were performing well. In reality, Stauffer traded very little, if any, investor funds: his forex trading was merely the cover for a Ponzi scheme. The statements were forged, and the profits were imaginary.[1] After Stauffer told investors that he lost their money in a hack of his brokerage account, the Federal Bureau of Investigation (FBI), Internal Revenue Service (IRS), and Commodity Futures Trading Commission (CFTC) opened criminal and civil investigations. In February 2015, he was indicted on one count each of wire fraud and money laundering.

At trial, several investors testified regarding how they came to invest with Stauffer, the representations he made to them, and the hacking story he told when the scheme began to fall apart. Doug Baker's testimony is representative. After he learned that Stauffer was a forex trader, Baker asked to invest and signed an agreement allowing Stauffer to trade foreign currency on his behalf, making an initial investment of $20,000. The contract provided that the investment would be part of a common fund with a target 5% monthly compounding return, that Stauffer was not permitted to use funds for personal use, and that he would receive a share of any profits. Baker made subsequent investments totaling $350,000. Each month, Baker received payments and account statements purporting to be from the United Kingdom branch of Interactive Brokers (IB), an Internet-based broker.

---

[1] As in a typical Ponzi scheme, some of Stauffer's investors realized a "return" on their investments because they received payouts that he presented as trading profits (but that were in truth principal invested by others). The presentence report identifies twelve investors (including joint investors from the same family), four of whom were victims who lost money. These victims lost $4,738, $7,296, $12,645, and $821,000, respectively. The total amount invested in the scheme was $1,918,928.

The payments stopped after July 2013, however, when Stauffer sent an email to Baker explaining that his online IB account had been hacked and a "considerable amount" of the funds were lost by the hacker making money-losing trades. Trial Tr., R. 96, PID 718–720. Baker received a statement in July 2013 that purported to be for IB account "U90," with an opening balance of $890,322.40 and a closing balance of $192,450. The statement also indicated that the U90 account had margin-trading capabilities.

IB's records contradicted Stauffer's hacking story. Brad Klauseger, an employee in IB's compliance department, testified that IB maintains a database recording all trading activity in an account, and that no two accounts have the same number. IB's records showed that Stauffer had two accounts, "U90" and "U10." The U90 account was opened in June 2010 as an "individual" non-margin account, and was closed in September 2010 without ever being funded. The U10 account permitted currency conversion, but not leveraged forex trading; it was opened in August 2012 and was funded once with $10,000. The Government introduced as exhibits IB statements Stauffer had sent to investors. Klauseger testified that these statements were not genuine because the notations and trading activity they reflected were inconsistent with the records in IB's database. For example, a purported statement showed the U90 account as being an "advisor" and "margin" account, when in reality it was a non-margin "individual" account; the statements also falsely showed that Stauffer's accounts were with IB's United Kingdom, rather than the United States, branch.

The trial lasted four days; the defense presented no evidence and Stauffer did not testify. In its closing argument, the Government argued that Stauffer accepted funds on the false pretense that they would be added to his forex fund and invested. Instead, he forged IB statements to make it appear as if he was actively engaged in forex trading, used investors' funds

in a Ponzi-scheme-like manner (diverting money to personal use—such as paying living expenses and credit-card debt—while using later investments to pay "profits" on earlier investments), and falsely claimed to have been the victim of a hack to cover up the resulting losses.

In his closing argument, Stauffer argued that he did operate a forex fund just as he had told investors, that his hacking story was true and the IB statements he gave investors were genuine, and that the Government failed to investigate IB's records or security practices. Further, Stauffer pointed out that the Government found no templates on his computers from which he could forge IB statements, argued that IB's records showed no funding in the U90 account because "[i]f the account was hacked, of course it's going to not show any money in it," and iterated that someone hacked his account and "changed just enough details to make it look like he never funded it." Trial Tr., R. 99, PID 1350, 1352. The jury convicted him of both counts.

## II

### A

Stauffer first argues that the district court erred in denying him CJA funds to hire a digital-forensic expert, who he hoped would find metadata on his computer showing that his IB statements were genuine and that his accounts were actually funded and active prior to being hacked.

We review a district court's decision whether to authorize CJA funds for non-attorney services for abuse of discretion. *United States v. Gilmore*, 282 F.3d 398, 406 (6th Cir. 2002). A district court abuses its discretion when it applies the incorrect legal standard, misapplies the

correct legal standard, or relies on clearly erroneous factual findings. *United States v. Bridgewater*, 606 F.3d 258, 260 (6th Cir. 2010) (citations omitted).

Under the CJA, "[c]ounsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application." 18 U.S.C. § 3006A(e)(1). In order to obtain CJA funds for an expert, an indigent defendant must show that (1) engaging the expert is necessary for the defendant to mount a plausible defense and (2) the defendant's case would be prejudiced without those funds. *Gilmore*, 282 F.3d at 406.

Stauffer's assets were frozen in a parallel enforcement action brought by the CFTC. He originally had appointed counsel, but friends agreed to pay for retained criminal-defense counsel, and the district court granted Stauffer's motion to substitute counsel. During a hearing on the motion, the prospective retained counsel expressed his satisfaction that the funds raised by Stauffer's friends were sufficient compensation to see the case through, and that he accepted the risk that friends who had agreed to finance parts of the defense would not pay.

After the hearing, Stauffer sought CJA funds to engage a digital-forensic expert, explaining that although he had retained counsel, he was indigent and unable to pay the expert's fees. At an ex parte hearing on that motion, Stauffer offered that the expert's fees would be approximately $4,000 and that he would examine Stauffer's computer for metadata that would show whether the IB statements Stauffer provided to investors were actually generated from IB before his account was hacked. Such a finding would rebut the Government's theory that Stauffer did not fund his IB account or trade, but rather forged the statements. The district court orally denied the motion on the basis that retained counsel represented at the substitution-of-counsel hearing that the defense had the resources it needed, remarking that the need for a

digital-forensic expert was foreseeable and should have been addressed when Stauffer substituted counsel.

The court also questioned the value to the defense if the expert found metadata consistent with Stauffer's theory, because Stauffer would need to testify to establish a foundation for the expert's findings and thus the jury's view of those findings would rest largely on how it judged Stauffer's own credibility. Before denying the motion, the court noted further that the cost of the expert was within reach for the defense to cover, and suggested that the judge in the parallel CFTC action might unfreeze funds to pay for the expert.[2]

On appeal, Stauffer presents a hybrid argument that the district court erred in denying him CJA funds for an expert, and that this denial prejudiced the effectiveness of his trial counsel. To the extent that he raises an ineffective-assistance-of-counsel claim, we generally do not consider such claims on direct appeal. *Massaro v. United States*, 538 U.S. 500, 504–05 (2003) ("When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose."); *United States v. Williams*, 612 F.3d 500, 508 (6th Cir. 2010). We therefore decline to address whether trial counsel was effective, without prejudice to Stauffer raising ineffective-assistance claims in a 28 U.S.C. § 2255 proceeding.

That leaves the question whether the district court erred in denying Stauffer CJA funds. The district court concluded that the defense had the wherewithal to cover $4,000 if it believed that engaging an expert was necessary to mount a plausible defense, and further suggested that Stauffer ask the judge in the civil case to unfreeze any necessary funds. Neither the civil nor the

---

[2] The civil and criminal cases were presided over by separate judges of the Western District of Michigan.

criminal docket shows Stauffer heeding the court's suggestion or returning to the court claiming that efforts to raise funds had been unsuccessful.

Further, the district court doubted that an expert would have benefited the defense. *See* Fed. R. Crim. P. 52(a); *see also Gilmore*, 282 F.3d at 406 ("A district court need not grant an indigent's motion under § 3006A on the off chance that the requested services might turn up something."). The IB statements Stauffer provided to his investors presented information—such as funding levels, opened/closed status, account type, margin capability, and branch location—that IB's records contradicted. Genuine statements generated from IB would have reflected the authoritative data in its records. Stauffer asserts that his online account was hacked. Although that assertion is plausible standing alone, there is nothing in the record that plausibly suggests that IB's database was also accessed such that a hacker could have altered its records to contradict so thoroughly the account statements that Stauffer claims are genuine. Further, IRS Special Agent Barbara Birdsong testified that she examined Stauffer's personal banking records, finding that the investment funds were deposited into his personal accounts, that the accounts' funds were used to pay for personal expenses and to repay investors, and that their fund flows corroborated Klauseger's testimony that U90 was never funded and that U10 was funded with $10,000. With these considerations in mind, it was improbable that a digital-forensic examination would have yielded evidence favorable to the defense.

Because CJA funds were not "necessary" for Stauffer to present a plausible defense, and because he was not "prejudiced without those funds," the district court did not err in denying them. *Gilmore*, 282 F.3d at 406.

**B**

Stauffer next argues that his sentence is procedurally unreasonable because the district court erroneously applied (1) a commodities-law enhancement and (2) an obstruction-of-justice adjustment to his sentencing guidelines.

We review "a district court's interpretations of the Sentencing Guidelines de novo and findings of fact at sentencing for clear error." *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012) (internal citation and quotation marks omitted). A sentence is procedurally unreasonable if the district court failed to "properly calculate[] the applicable advisory Guidelines range . . . ." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007).

First, we consider Stauffer's argument that the district court erred in applying a commodities-law enhancement to his base offense level. The Sentencing Guidelines provide for a four-level enhancement if the defendant's offense involved "a violation of commodities law and, at the time of the offense, the defendant was . . . a commodity pool operator [(CPO)]." U.S.S.G. § 2B1.1(b)(19)(B). Stauffer acknowledged at trial that his investors were told that their funds would be pooled, but he disputes that he was a CPO because, he argues, foreign currency is not among the enumerated commodities listed in the Commodity Exchange Act (CEA)'s definition of "commodity." *See* 7 U.S.C. § 1a(9).

In support of his argument that he was not a CPO, Stauffer cites *Commodity Futures Trading Comm'n v. Erksine*, 512 F.3d 309, 325–26 (6th Cir. 2008), in which we held that the CFTC lacked jurisdiction to regulate forward contracts (as distinguished from futures contracts) for foreign currency. However, in *Erksine* we addressed whether foreign-currency forward contracts fall under the CFTC's jurisdiction to regulate "transactions involving contracts of sale of a commodity for future delivery," *id.* at 314 (quoting 7 U.S.C. § 2(a)), not whether foreign

currency is a commodity. Moreover, *Erksine* preceded the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank), Pub. L. 111-203, 124 Stat. 1376, 1659 (Jul. 21, 2010), which expanded the definition of CPO. In its brief on appeal, the Government correctly notes that the CEA now covers forex trading. *See Commodity Futures Trading Comm'n v. Cook*, CV-09-3332, 2016 WL 128131, at *3–4 (D. Minn. Jan. 12, 2016); *Commodity Futures Trading Comm'n v. Complete Devs., LLC*, 4:10-CV-2287, 2013 WL 1910436, at *7–8 (N.D. Ohio May 8, 2013); *Commodity Futures Trading Comm'n v. Gresham*, 3:09-CV-75, 2011 WL 8249266, *2–3 (N.D. Ga. Sept. 8, 2011). Stauffer fails to respond to this argument in his reply brief.

In his opening brief, Stauffer further argued that his being sentenced as a CPO is at odds with the Government's theory at trial that he did not trade investors' funds and was not actually engaged in the forex business. But what is required in this regard is that Stauffer "engage[] in a business that is of the nature of a commodity pool" and "in connection therewith . . . accept[]" from others funds "for the purpose of trading in commodity interests." 7 U.S.C. § 1a(11)(a)(1). The Government and Stauffer both agree that he accepted investors' funds to be a part of a forex fund that he would trade. Stauffer thus satisfied the requirements without regard to whether he followed through with actual trades.

Second, we consider Stauffer's argument that the district court erred in applying an obstruction-of-justice adjustment to his total offense level. The Sentencing Guidelines provide for a two-level adjustment if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense . . .

." U.S.S.G. § 3C1.1. Qualifying obstructive conduct includes "destroying or concealing . . . evidence that is material to an official investigation or judicial proceeding . . . ." *Id.* at cmt. n.4(D). Destroying or concealing evidence sought by a regulatory agency conducting a parallel investigation of the "instant offense" also qualifies for the adjustment. *See United States v. Vysniauskas*, 593 F. App'x 518, 532 (6th Cir. 2015) (parallel state police investigation); *see also United States v. Luca*, 183 F.3d 1018, 1022 (9th Cir. 1999) (parallel state administrative investigation).

As part of the parallel enforcement action against Stauffer, the district court ordered him to surrender his computer to the CFTC and not to tamper with or alter its contents. At sentencing, an FBI investigator testified based on information relayed to him by the CFTC's trial attorney and forensic examiners. The investigator testified that forensic examination showed that the night before the computer was to be surrendered, its contents had been backed up to a Seagate-brand external hard drive, which was not disclosed or surrendered to the CFTC. This examination also revealed that two software programs designed to delete files and make them unrecoverable were run on the computer the day it was surrendered, and that neither program was set to run automatically. The CFTC examiners also found references to dozens of deleted IB-related Word and PDF files that existed on the computer approximately twelve days before it was surrendered. None of the computer's extant files related to IB.

In overruling Stauffer's objection to the obstruction-of-justice adjustment, the district court accepted the unrebutted facts from the FBI investigator's testimony. It acknowledged the possibility of an innocent explanation, e.g., that Stauffer used the software programs to defragment his hard drive. The court found, however, that the preponderance of the evidence led

it to conclude that Stauffer intended to destroy evidence that was relevant to both his civil and criminal cases.

Given the testimony of the FBI investigator—and the strong inferences that follow from backing up one's computer the night before and running deletion software the day of its surrender to investigators—the district court did not err in finding that Stauffer intentionally destroyed evidence that was relevant to the instant offense. Although the court did not expressly find that this destroyed evidence was "material," *see* U.S.S.G. § 3C1.1 cmt. n.4(D), the record supports an inference that Stauffer deleted the dozens of IB-related files because they were incriminating. Because the CFTC was investigating the offense that was the subject of Stauffer's criminal prosecution, his destruction of evidence sought in that investigation qualified as obstruction of justice under the Sentencing Guidelines. *See id.*

## III

For the reasons set forth above, we **AFFIRM** the judgment of the district court.